## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CARY ARBOLIDA,                          )
                                        )
                        Plaintiff,      )
                                        )
vs.                                     )        Case No. _____
                                        )
NATIONAL COLLEGIATE ATHLETIC            )
ASSOCIATION                             )
                                        )
                        Defendant.      )
                                        )

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Comes now Plaintiff Cary Arbolida ("Arbolida") and files this Verified Complaint for Damages and Injunctive Relief against Defendant the National Collegiate Athletic Association ("NCAA"), and for his causes of action against the NCAA states as follows:

### I.     NATURE OF CASE

1.      Arbolida brings this action to enjoin the NCAA from arbitrarily enforcing certain NCAA Bylaws against him that would prohibit him from playing a third and a fourth year of Division I baseball due to his time spent playing baseball at a two-year junior college ("JUCO"), on the grounds that enforcement of such Bylaws violates Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, among other claims, and would cause substantial and irreparable harm to Arbolida.

### II.    PARTIES AND JURISDICTION

2.      Arbolida is a college baseball player. He currently resides in Manhattan, Kansas. Arbolida played baseball for three years at a junior college before enrolling at the University of Houston, an NCAA Division I institution. He played two years of Division I baseball

at the University of Houston, where he was a standout player. He is now a member of the Kansas State University ("KSU") baseball team, where he seeks to play a third and fourth year of Division I baseball.

3.     The NCAA is an unincorporated, member-led organization that acts as the governing body for collegiate athletics. The NCAA is made up of over 1,100 member institutions, divided into Division I, Division II, and Division III schools. Over 350 of the NCAA member institutions are Division I schools, including KSU.

4.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 4, 15 U.S.C. § 15, 15 USC § 26, and 28 U.S.C. §§ 1331 and 1337.

5.     This Court may exercise personal jurisdiction over the NCAA because the NCAA currently transacts business in Kansas. The NCAA and its member institutions, including KSU, conduct sports competitions, ticket and merchandise sales and other revenue-generating activities in Kansas.

6.     Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

### III.     FACTUAL BACKGROUND

**A.     The NCAA**

7.     The NCAA sets the rules and regulations that member institutions and athletes must follow on and off the field. If a collegiate institution wants to participate in the highest level of collegiate athletics (Division I), it must maintain membership with the NCAA and abide by the NCAA rules and regulations. If an athlete wants to participate in Division I athletics, the athlete must enroll at an NCAA member institution and comply with the NCAA rules and regulations. The NCAA regulates and controls Division I athletics through the Bylaws published in its Division I Manual ("Bylaws"), a copy of which is attached hereto as **<u>Exhibit 1.</u>**

8. The NCAA was created to act in the best interest of student athletes. The NCAA's main priority is to coordinate and deliver safe, fair and inclusive competition directly and by member institutions. However, the NCAA profits substantially off the services of its athletes. The NCAA generated nearly $1.3 billion in revenue for 2022-2023 through various media rights and marketing deals tied to its championship athletic events.[1]

9. Although the NCAA considers junior colleges to be "collegiate institutions" for purposes of determining an athlete's eligibility, it does not govern or control junior college athletics. Junior college athletics are governed primarily by the National Junior College Athletic Association ("NJCAA"), which has no affiliation with the NCAA.

**B.     Name, Image, and Likeness Compensation**

10. In 2021, the U.S. Supreme Court held in *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021), that the NCAA's rules and restrictions on compensating college athletes are subject to the Sherman Act and affirmed a decision invaliding one of those rules.

11. Following *Alston*, the NCAA has permitted college athletes to earn money on the use of their name, image and likeness ("NIL").

12. While athletes in all NCAA Divisions are permitted to earn NIL compensation, the reality is that most NIL money is earned by Division I athletes and there are no meaningful NIL opportunities for JUCO players. Arbolida's first opportunity to earn NIL compensation was while playing Division I baseball.

13. Division I college baseball players can earn significant amounts of NIL compensation, with some teams having annual budgets of up to $4,000,000 to compensate their

---

[1] *NCAA generates nearly $1.3 billion in revenue for 2022-2023,* Associated Press (Feb. 1, 2024), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23.

roster.[2] In some cases, Division I college baseball players can earn more in NIL compensation than they would playing professional baseball.[3] The amount of NIL compensation being paid to Division I baseball players continues to grow each year.[4]

14.    In addition, as part of a recent NCAA settlement, Division I schools will be allowed to share athletic department revenue with their varsity athletes beginning in the 2025-2026 academic year. Baseball players at many Division I schools, including Big 12 schools like KSU, will begin to receive NIL compensation directly from their schools.[5]

**C.    The Labor Market**

15.    As the Supreme Court has recognized, the NCAA "controls the market for college athletes." *Alston*, 141 S. Ct. at 2167 (Kavanaugh, J., concurring).  In the Division I sports labor market, athletes compete for spots on individual team rosters in their specific sport.  The process for obtaining a spot on a Division I athletic team is highly competitive.  The NCAA estimates that more than eight million athletes play a high school sport, while only 530,000 of those will compete as NCAA athletes in any Division.  According to the NCAA's statistics, less than 2.5% of high school baseball players will compete in Division I baseball.[6]

---

[2] *MLB teams now face new competition for talent: college program awash with money*, The Athletic  (Dec.  5,  2024),  https://www.nytimes.com/athletic/5969723/2024/12/05/mlb-college-baseball-nil-draft-competition/.

[3] *Id.*

[4] *College baseball coaches on NIL, transfer portal: The Athletic's coaches forum*, The Athletic  (Feb.  13,  2025),  https://www.nytimes.com/athletic/6128817/2025/02/13/college-baseball-coaches-nil-transfer-portal/.

[5] *College baseball in flux: What do coaches think about roster caps, revenue sharing?,* The Athletic  (Feb.  12,  2025),  https://www.nytimes.com/athletic/6126932/2025/02/12/college-baseball-coaches-roster-revenue-sharing/?onboarded=true.

[6] *Estimated  probability  of  competing  in  college  athletics,*  NCAA  (April  1,  2024),  https://www.ncaa.org/sports/2015/3/2/estimated-probability-of-competing-in-

16.     Division I institutions compete against each other in recruiting top talent by offering various benefits, such as scholarships, access to top tier training facilities and coaching staffs, medical treatment, opportunities to compete at the highest collegiate level, exposure to scouts and other recruiters, nationwide publicity, and the opportunity to negotiate marketing deals and earn NIL compensation.  The NCAA recognizes that JUCO transfers are an important part of the Division I sports labor market, noting that "every year hundreds of talented JUCO players transfer to NCAA Division I four-year colleges around the country looking to make an impact."[7]

17.     The relevant geographic market is the United States.  The NCAA and its Division I member institutions are located and compete nationwide.

18.     There are no alternatives to the NIL opportunities or other resources and benefits Division I athletes receive from participating in Division I athletics.  The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power.  The NCAA fully controls and dictates the rules and regulations for participation in Division I athletics, and athletes who wish to participate in Division I athletics have no choice but to comply. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield financial revenue for the member institutions.

D.     **The Five-Year Eligibility Rule**

---

college-athletics.aspx.

[7] *College baseball's top 50 impact JUCO transfer hitters*, NCAA (Dec. 4, 2024), https://www.ncaa.com/news/baseball/article/2024-12-04/college-baseballs-top-50-impact-juco-transfer-hitters.

19.     Bylaws 12.8 and 12.8.1 state that "a student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport" and must complete "all seasons of participation in all sports within … five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution."   Pursuant to Bylaw 12.8.1.1, the five-year eligibility clock begins to run from the date an athlete registers as a full-time student and attends the first day of class at any "collegiate institution," regardless of whether the institution is an NCAA member and regardless of whether or not the athlete participates in any sports.

20.     For athletes who competed during Spring 2020 athletic seasons, the NCAA granted them a blanket waiver, disregarding their 2020 season of competition due to COVID-19 and allowing them six academic years to complete five years of eligibility.[8]

21.     Pursuant to Bylaw 12.8, an athlete could attend a non-member junior college for one year without playing any sports, but that athlete's eligibility clock for Division I athletics has started, while another athlete could play a year of baseball at a post-secondary prep school with no repercussions as to eligibility, because his or her eligibility clock has not yet started.

E.     **The Intercollegiate Competition Rule**

22.     Bylaw 12.02.6 states that "intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution … represents the institution in any contest against outside competition … competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution … or competes and receives expenses (*e.g.*,

---

[8] *2021 NCAA Division I COVID-19 Question and Answer Guide* (July 30, 2021), NCAA https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19QAGuide.pdf.

transportation, meals, housing, entry fees) from the institution for the competition."

23.    Pursuant to Bylaw 12.02.6, intercollegiate competition includes athletic competition at a two-year junior college, even though the competition, resources, benefits and NIL opportunities are not equivalent to those available to Division I athletes, and even though athletes competing in other competitions, such as prep-school competitions, are not charged any Division I eligibility.

## F.    Definition of Collegiate Institution

24.    Bylaw 14.02.4 defines a "collegiate institution" to include an institution of higher education that is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree or that conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree.

25.    Thus, junior colleges fall within the definition of a "collegiate institution" even though they are not NCAA member institutions.

## G.    Arbolida's Competition in Collegiate Baseball

26.    Arbolida enrolled at Orange Coast College ("OCC"), a two-year junior college, in the Fall of 2019.  He competed on the OCC baseball team during the Spring 2020 season, which was cut short due to COVID-19.  Due to the NCAA's COVID-19 relief for athletes competing in the Spring of 2020, Arbolida's Spring 2020 baseball season did not count as a year of NCAA eligibility.

27.    In Fall 2020, Arbolida enrolled at the University of California-Santa Barbara ("UCSB") intending to play baseball on UCSB's baseball team, but ultimately did not compete in

any competitions or competitive seasons while enrolled at UCSB.

28.    In Spring 2021, Arbolida re-enrolled at OCC. Arbolida played baseball at OCC for the Spring 2021 and Spring 2022 seasons.

29.    The National Junior College Athletic Association granted COVID-19 relief to all NJCAA student-athletes who participated in a sport during the 2020-21 academic year, pursuant to which all 2020-21 sport seasons did not count towards student-athlete eligibility.

30.    Under the Bylaws, Arbolida's 2021 and 2022 JUCO years each count as a year of NCAA eligibility, leaving him with only two years of Division I eligibility.

31.    Arbolida graduated from OCC in the Spring of 2022 with an associate's degree in liberal arts.

32.    Arbolida then enrolled at the University of Houston ("UH") in Fall 2022.  UH is a member of the Big 12 and a Division I institution for men's baseball.  Arbolida played baseball at UH for the Spring 2023 and Spring 2024 seasons, using two years of his Division I eligibility.  Arbolida was 2024 All-Big 12 Second Team selection, set the UH single-season slugging percentage record, and led the team in home runs and batting average.

33.    Arbolida graduated from UH in Spring 2024 with a bachelor's degree in sociology.  He was not selected for the 2024 MLB draft.

34.    After graduating from UH, Arbolida enrolled in a post-graduate program at the University of Tampa in Fall 2024 to pursue a degree in entrepreneurship.  Arbolida was a member of the University of Tampa Division II baseball team in Fall 2024.  Arbolida would have preferred to play a third and fourth year of Division I baseball given the higher level of competition, opportunity to increase his NIL marketability and earnings, nationwide exposure, and other benefits and resources available to Division I athletes.  But, Arbolida believed that he was ineligible

for third and fourth years of Division I baseball, due to the NCAA's Bylaws that penalize him for playing two years of JUCO baseball.

**H.     U.S. District Court Enjoins the NCAA From Enforcing Bylaws Against Deigo Pavia**

35.     In November 2024, Diego Pavia, the starting quarterback for Vanderbilt University, filed a complaint for injunctive relief in the Middle District of Tennessee, seeking to enjoin the NCAA from enforcing the same Bylaws at issue in this case, which would have counted Pavia's year of JUCO football as a year of NCAA eligibility, leaving him with only three years of Division I eligibility instead of four.  *Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024).

36.     On December 18, 2024, the U.S. District Court for the Middle District of Tennessee issued a preliminary injunction enjoining the NCAA from enforcing Bylaw 12.02.6 against Pavia, permitting Pavia to compete in a fourth year of Division I football.  The court opined that Pavia was likely to succeed on the merits of his claim that the NCAA's enforcement of the Bylaws requiring JUCO years to be counted as NCAA Division I eligibility years violates the Sherman Act, and that Pavia would suffer immediate and irreparable harm if not granted injunctive relief.

**I.     NCAA Issues Blanket Waiver Allowing Athletes with JUCO Years to Compete in 2025-2026 Academic Year**

37.     Following the *Pavia* decision, the NCAA Division I Board of Directors issued a blanket waiver in December 2024 providing certain former JUCO athletes with a fourth year of Division I eligibility ("Blanket Waiver").  Specifically, athletes with JUCO years who used their third year of Division I eligibility in 2024-2025 are permitted to compete in a fourth year of Division I sports during the 2025-2026 season.  A copy of the Blanket Waiver announcement is attached hereto as **<u>Exhibit 2.</u>**

38.     Although Pavia and Arbolida have nearly identical collegiate eligibility records

(one year disregarded for COVID-19, one JUCO year, and three Division I years for Pavia and one year disregarded for COVID-19, two JUCO years, and two Division I years for Arbolida), the NCAA's Blanket Waiver does not, on its face, extend relief to Arbolida. Unlike football, collegiate baseball is played in the Spring. Therefore, Arbolida must use his third year of Division I eligibility during the Spring 2025 baseball season. Because the NCAA Blanket Waiver extends eligibility only to athletes using their fourth year of Division I eligibility for Fall 2025 or Spring 2026 seasons, Arbolida is not covered by the waiver. This arbitrary distinction harms Arbolida and is another example of the NCAA's unlawful restrictions on the market for Division I athletics.

**J.    Arbolida's Waiver Request**

39.    Because Arbolida has used even fewer years of Division I eligibility than Pavia, Arbolida believed he would be eligible to play, at the very least, a third year of Division I baseball. Arbolida decided to enter the transfer portal on January 3, 2025, because he wanted the opportunity to play at the highest competitive level, access to other benefits and resources that are available to Division I athletes, such as top tier coaching and training staff and nationwide publicity, and the opportunity to increase his marketability and earn NIL compensation.

40.    KSU began recruiting Arbolida on January 4, 2025. KSU is a Division I institution in the Big 12. The 2024 KSU baseball team made it to the NCAA tournament super regionals and was ranked in the top 25 of all four final NCAA Division I baseball rankings. The NIL opportunities and resources available to Arbolida at KSU are better than those available to him at other non-Division I institutions. Arbolida committed to KSU and applied for admission in late January 2025. After being admitted, Arbolida enrolled in classes full-time. Arbolida arrived in Manhattan, Kansas on or about February 6, 2025. Arbolida would be able to earn at least $50,000 in NIL compensation if he is able to play Division I baseball at KSU in the Spring 2025 season.

41.     KSU promptly submitted a waiver request to the NCAA on behalf of Arbolida on February 7, 2025.  The wavier requested that at least one year of Arbolida's JUCO baseball not count toward his four years of NCAA Division I baseball eligibility for the same reasons that Pavia's year of JUCO football did not count toward his four years of Division I football eligibility.  A copy of the waiver request is attached hereto as **Exhibit 3.**

42.     As of February 14, 2025, seven days after the waiver request was filed, the NCAA had not yet assigned a representative to Arbolida's case.  The NCAA has yet to issue a decision on Arbolida's waiver request.

43.     Given the urgency of Arbolida's situation, he could not wait any longer for the NCAA to issue a decision on his waiver request. KSU's Spring 2025 baseball season opens on February 14, 2025.

44.     Given the lack of guidance and inaction by the NCAA, Arbolida is now past the time during which he could have enrolled in another institution for the Spring 2025 term.

**K.     NCAA Bylaws Violate the Sherman Act**

45.     The Bylaws enforced by the NCAA are adopted through member institutions and the Division I council and constitute horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I athletes.

46.     The Bylaws at issue in this case violate Section 1 of the Sherman Act by restraining the free market for NCAA Division I athletics by precluding Arbolida and other similarly situated athletes who enrolled in junior colleges from earning NIL compensation, accessing top tier resources, and gaining valuable exposure at the highest level of competition while playing four years of Division I athletics.  The Bylaws restrain certain college athletes who transfer from a junior college from taking advantage of four years of Division I eligibility, while affording that

11

freedom to other athletes who enroll at Division 1 institutions as freshmen. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college athletes and member institutions.

47.     The Five-Year Rule violates the Sherman Act by starting each athlete's eligibility clock while the athlete is attending a non-NCAA institution where they lack access to the resources and benefits of Division I schools and are effectively unable to earn NIL compensation. The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the JUCO level (where little to no NIL is available) as reasonably commensurate with the opportunities and benefits available while playing NCAA Division I athletics.

48.     Without application of these anticompetitive Bylaws, there would be high demand for the services of Arbolida and other similarly situated athletes, as demonstrated by the fact that KSU recruited Arbolida one day after he entered the transfer portal.

49.     The Bylaws disproportionately harm JUCO and former JUCO athletes in the Division I athletics market because the eligibility restraints force them to make decisions about whether to attend a junior college, whether to participate in sports while attending a junior college, whether to obtain a degree from a junior college, or whether to transfer to an NCAA Division I institution.

50.     The Bylaws harm athletes when they are making these decisions because attending a junior college limits the athlete's possibility of Division I eligibility to three years. The Bylaws further harm athletes by making them choose between foregoing playing a sport while attending junior college, which still starts the athlete's eligibility clock, or limiting athletic participation to one year in an effort to preserve the full extent of their already reduced three years of Division I eligibility. If these athletes choose to participate in sports and stay at a junior college long enough

to obtain their two-year degree, their Division I eligibility will be further reduced to two years. Other Division I athletes do not face these restrictions.

51.    If the NCAA is permitted to enforce these anticompetitive Bylaws against Arbolida, Arbolida will suffer immediate and irreparable harm. The lost opportunity that comes with missing a Division I college baseball season cannot be remedied with monetary damages only. Not only will Arbolida's future potential NIL earnings suffer, but he will be denied the intangible benefits of competing at the Division I level, such as a year of developing his game under top tier coaching and training staff, the nationwide exposure of playing Big 12 baseball, and increased draft prospects.

**L.    The Rule of Restitution**

52.    If the Court grants Arbolida the injunctive relief to which he is entitled, the Court should also enjoin the application of Bylaw 12.11.4.2, which permits the NCAA to provide "restitution" in the event the Court's injunctive order prohibiting the enforcement of Bylaw 12.02.6 against Arbolida is vacated, stayed, reversed or otherwise determined to be not justified. Under Bylaw 12.11.4.2, restitution can include, but is not limited to, vacating athlete and member institution records, postseason bans, and financial penalties. Granting Arbolida injunctive relief, while simultaneously permitting the NCAA to punish and/or retaliate him and/or KSU for acting in accordance with the Court's order would be inconsistent.

## IV.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

53.    Arbolida incorporates the factual allegations above as if fully set forth herein.

54.    The NCAA effectively controls the labor market for Division I athletics and enjoys monopsony power in the market for Division I athletics.

55.    The NCAA's actions as described herein have unreasonably restrained competition in the market for Division I athletics.

56.    The NCAA has entered into unlawful horizontal agreements with its member institutions to restrain competition in the relevant market through adoption and enforcement of the anticompetitive Bylaws cited herein.  Specifically, the NCAA has unlawfully restrained the ability of Division I college athletes who transfer to the NCAA from a non-NCAA institution to play Division I athletics for the same number of years offered to other college athletes.

57.    The NCAA's actions are a *per se* violation of Section I of the Sherman Act. Alternatively, the NCCA's enforcement of the Bylaws at issue constitute an unreasonable restraint of trade that cannot withstand analysis under the rule of reason framework.  The rule of reason framework can be conducted with a "quick look" or "twinkling of the eye" in this case. *Alston*, 594 U.S. 69, 81 (citing *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 110 n.39 (1984)).

58.    The market for Division I athletic services, in which each athlete competes for roster spots in their respective sport, is the relevant antitrust market. The transactions between the NCAA and NCAA member institutions and the college athletes in this market are commercial in nature and covered by the Sherman Act.

59.    The NCAA's actions have unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as Division I institutions are prohibited from retaining the services of a JUCO transfer, like Arbolida, for the full four years they are permitted to retain the services of other college athletes. This limitation disadvantages JUCO players seeking to transfer to an NCAA Division I institution along with former JUCO players currently playing for an NCAA Division I institution and prevents such players from realizing the

benefits of competing in NCAA Division 1 athletics for the same length of time available to all other college players, harming their current and future earning potential.

60.    Additionally, the NCAA has arbitrarily and capriciously applied the Bylaws in such a manner as to unreasonably and irreparably harm Arbolida by granting certain former JUCO athletes a fourth year of Division I eligibility through its Blanket Waiver while simultaneously denying Arbolida a third year of Division I eligibility without any justifiable reason.

61.    The NCAA's and its member institutions' anticompetitive actions were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

62.    The NCAA Bylaws restricting Arbolida's eligibility are not procompetitive, and any benefits they provide are far outweighed by the harm to competition and to the college athletes who are subject to the Bylaws.

63.    Moreover, the Bylaws can be modified to impose less restrictive alternatives to accomplish any procompetitive goals the NCAA may allege. Reasonable and less restrictive alternatives available to the NCAA's current Bylaw enforcement practices, include, but are not limited to: (1) starting a college athlete's eligibility clock when the athlete enrolls in classes at "an NCAA member institution" rather than a two-year collegiate institution; (2) defining "intercollegiate competition" to include competition as part of "an NCAA member institution" as opposed to as part of a two-year collegiate institution; or (3) allowing athletes to compete in five seasons of eligibility during their eligibility clock – an alternative which the NCAA is allegedly already considering.[9]

---

[9] *NCAA considering allowing five years of eligibility for players in all sports*, CBS Sports, https://collegehoopstoday.net/rothstein-files/ncaa-considering-allowing-five-years-of-eligibility-for-players-in-all-sports/.

64.     Additionally, rational, consistent, unbiased and transparent application of its Bylaws and waivers, both individual and blanket, would allow for a more reasonable and less restrictive alternative to the NCAA's current anticompetitive practices.

65.     As a direct result of the NCAA's unlawful conduct, Arbolida has suffered and will continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the NCAA Bylaws.

66.     The NCAA's conduct in seeking to enforce its anticompetitive Bylaws is ongoing and will continue to cause irreparable harm to Arbolida unless injunctive relief is granted. This ongoing harm has caused, and continues to cause, direct harm to Arbolida by restricting his ability to increase his market worth and earn NIL compensation, limiting his future opportunities to showcase his skills and talent for MLB personnel, denying him the opportunity to develop his talent while having access to top tier coaching, facilities and resources, denying him the opportunity to play collegiate games at the highest level as a member of a Big 12 team, and does so as an unreasonable restraint on the labor markets for Division I athletics. Additionally, the time for Arbolida to transfer to another institution has expired, so if the NCAA is not enjoined from preventing Arbolida from using a third and fourth year of Division I eligibility, Arbolida will have no opportunity to play collegiate baseball.

67.     Arbolida asks for a temporary restraining order, preliminary injunction, and permanent injunction enjoining the NCAA from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8 and 12.02.6, as to Arbolida, and from enforcing NCAA Bylaw 12.11.4.2 to punish Arbolida and/or KSU for actions taken in compliance with any orders from this Court. Arbolida also asks the Court to explicitly rule that he is entitled to play Division I college baseball at KSU for the Spring 2025 and Spring 2026 seasons.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

68.     Arbolida incorporates the factual allegations above as if fully set forth herein.

69.     As an enrolled student at KSU and a member of KSU's baseball team, Arbolida has a business relationship with KSU that would be of pecuniary value to Arbolida.

70.     As part of that business relationship, Arbolida is entitled to and expected to participate on KSU's baseball team.

71.     The NCAA is aware of this relationship.

72.     Through improper means and with improper motive, the NCAA has tortiously interfered with this relationship by arbitrarily and capriciously refusing to grant Arbolida a waiver to which he is entitled, and by enforcing unlawful anticompetitive Bylaws that interfere with Arbolida's rights in the labor market.

73.     As a direct result of the NCAA's conduct, Arbolida is being prohibited from competing on KSU's baseball team, which would be of pecuniary value to Arbolida.

74.     The NCAA's interference with Arbolida's relationship with KSU has caused and will continue to cause Arbolida to suffer irreparable harm and monetary damages.

75.     Accordingly, Arbolida is entitled to injunctive relief and monetary damages.

## COUNT III
## BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

76.     Arbolida incorporates the factual allegations above as if fully set forth herein.

77.     Arbolida is party to a valid and enforceable agreement with the NCAA. In exchange for being a member of an NCAA Division I sports team, Arbolida has no choice but to comply with the NCAA Bylaws and regulations which the NCAA imposes.

78.     The NCAA has breached its contractual obligations to Arbolida by seeking to

enforce unlawful, anticompetitive Bylaws against Arbolida which interferes with his rights in the labor market.

79.     The NCAA also has a duty to carry out its contractual obligations in a manner that is fair and reasonable and consistent with the implied obligation of good faith and fair dealing that it owes to Arbolida.

80.     By seeking to enforce unlawful, anticompetitive Bylaws against Arbolida and by arbitrarily excluding Arbolida from a blanket eligibility waiver provided to other similarly situated former JUCO athletes, the NCAA has breached the implied covenant of good faith and fair dealing owed to Arbolida.

81.     The NCAA's unlawful conduct has caused and will continue to cause Arbolida to suffer irreparable harm and monetary damages.

82.     Accordingly, Arbolida is entitled to injunctive relief and monetary damages.

## COUNT IV
## BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – THIRD PARTY BENEFICIARY

83.     Arbolida incorporates the factual allegations above as if fully set forth herein.

84.     The NCAA is made up of member institutions and operates through valid and enforceable agreements with its member institutions.  Through these agreements, the NCAA agrees to provide member institutions with the opportunity to compete in Division I sports and, in return, the member institutions agree to abide by the rules and regulations adopted, interpreted and enforced by the NCAA.

85.     Division I athletes are the intended third-party beneficiaries of these agreements, as the NCAA publicizes that its priority is to provide "a world-class athletics and academic experience for student-athletes that fosters lifelong well-being" and to "coordinate and deliver safe, fair and

inclusive competition directly and by Association members."[10]

86.     Division I athletes were specifically contemplated as third-party beneficiaries of the agreements between the NCAA and its member institutions at the time the agreements were made.

87.     The NCAA has breached its obligations to the third-party beneficiaries by seeking to enforce unlawful, anticompetitive Bylaws which interfere with the rights of student athletes and Division I institutions in the labor market.

88.     The NCAA also has a duty to carry out its contractual obligations in a manner that is fair and reasonable and consistent with the implied obligation of good faith and fair dealing.

89.     By seeking to enforce unlawful, anticompetitive Bylaws against athletes and member institutions and by arbitrarily excluding Arbolida, a third-party beneficiary, from a blanket eligibility waiver provided to other similarly situated former JUCO athletes, the NCAA has breached the implied covenant of good faith and fair dealing.

90.     As a third-party beneficiary who has and will continue to suffer irreparable harm and monetary damages as a result of the NCAA's actions, Arbolida has standing to bring this claim.

91.     Accordingly, Arbolida is entitled to injunctive relief and monetary damages.

### PRAYER FOR RELIEF

WHEREFORE, Arbolida respectfully prays that this Court:

1.      Adjudge and decree that the NCAA's enforcement of NCAA Bylaws 12.8 and 12.02.6 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.      Enter a temporary restraining order restraining the NCAA from enforcing Bylaws

---

[10] *Mission    and    Priorities*,    NCAA,    https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx#:~:text=Provide%20world%2Dclass%20services%20to,improves%20health%2C.

12.8 and 12.02.6 against Arbolida and from enforcing Bylaw 12.11.4.2 against Arbolida and/or KSU for actions taken in compliance with any orders from this Court and declaring Arbolida eligible to compete in Division I baseball for the Spring 2025 and Spring 2026 seasons;

3.      Enter a preliminary injunction enjoining the NCAA from enforcing Bylaws 12.8 and 12.02.6 against Arbolida and from enforcing Bylaw 12.11.4.2 against Arbolida and/or KSU for actions taken in compliance with any orders from this Court and declaring Arbolida eligible to compete in Division I baseball for the Spring 2025 and Spring 2026 seasons;

4.      Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining the NCAA from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8 and 12.02.6 as to Arbolida, and from enforcing Bylaw 12.11.4.2 against Arbolida and/or KSU for actions taken in compliance with any orders from this Court and declaring Arbolida eligible to compete in Division I baseball for the Spring 2025 and Spring 2026 seasons;

5.      Award Arbolida monetary damages in an amount to be determined at trial;

6.      Award Arbolida his costs, including reasonable attorneys' fees, including treble damages, pursuant to 15 U.S.C. § 15;

7.      Arbolida demands a jury to hear all claims set forth herein for which he has the right to demand a jury; and

8.      Award Arbolida any other relief that this Court deems just and proper.

**KENNYHERTZ PERRY, LLC**

*s/ Milton Winter*
Milton Winter, KS Bar # 28776
Braden Perry, KS Bar # 21022
Kristen Andrews, KS Bar #30066
2000 Shawnee Mission Pkwy
Ste 210
Mission Woods, KS 66205
(816) 527-9447
mit@kennyhertzperry.com
braden@kennyhertzperry.com
kristen.andrews@kennyhertzperry.com

**Attorneys for Plaintiff Cary Arbolida**

**VERIFICATION**

Pursuant to Fed. R. Civ. P. 65 and 28 U.S.C. § 1756, I, Cary Arbolida, the Plaintiff in the above-captioned matter, declare that the foregoing facts alleged in the Verified Complaint are true and correct to the best of my knowledge, information, and belief.