**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CARY ARBOLIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. _____ |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION**</u>
<u>**FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

## I.      INTRODUCTION

Cary Arbolida ("Arbolida") has an opportunity to play a third year of Division I baseball for the winningest active Big 12 head baseball coach, to gain nationwide exposure, to increase his potential draft prospects, to access top tier facilities, and to earn compensation for the use of his name, image and likeness. Without intervention from this Court, the NCAA will prevent Arbolida from playing his third year of Division I baseball simply because he played baseball at a junior college ("JUCO"), where he was not afforded the same benefits and opportunities available to Division I athletes. The Bylaws which the NCAA seeks to enforce against Arbolida are anticompetitive in nature and restrain the market for Division I athletics by precluding athletes like Arbolida who enrolled in junior colleges from having the opportunity to earn NIL compensation and other benefits while playing four years of Division I athletics.

The U.S. District Court for the Middle District of Tennessee recently addressed this very issue in *Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024). The court found that Pavia, a Division I football player, was likely to succeed on the merits of his claim that the NCAA's enforcement of Bylaw 12.02.6 (the same Bylaw

at issue in this case) would violate the Sherman Act and that Pavia would suffer immediate and irreparable harm absent injunctive relief. *Id*. Accordingly, the court issued a preliminary injunction enjoining the NCAA from enforcing Bylaw 12.02.6 against Pavia, which would have prohibited Pavia from playing a fourth year of Division I football on account of his prior JUCO year. *Id.* Shortly thereafter, the NCAA issued a blanket waiver permitting athletes who attended and competed at non-NCAA schools, such as junior colleges, for one or more years to remain eligible and compete in a fourth season of Division I athletics for the 2025-2026 school year if the athletes otherwise would have used their final year of eligibility during the 2024-2025 school year ("Blanket Waiver"). (Compl. Ex. 2).

The *Pavia* case fits Arbolida like a glove, and, like Pavia, Arbolida should be granted injunctive relief. Permitting the NCAA to enforce Bylaw 12.02.6 against Arbolida to prohibit him from playing a third year of Division I baseball because of his prior JUCO participation would wrongfully restrain him from participating in the relevant market and, as set forth herein and in Arbolida's Motion and supporting declarations, would cause him to suffer immediate and irreparable harm. As such, Arbolida respectfully requests that this Court grant his Motion for a Temporary Restraining Order and Preliminary Injunction, in accordance with the rationale laid out in *Pavia*.

## II.    FACTUAL BACKGROUND

### A.    The NCAA and Its Bylaws

The NCAA is a powerful, unincorporated association that regulates and controls all aspects of collegiate athletics. It is made up of member institutions that are divided into Division I, Division II, and Division III institutions. Division I institutions represent the highest level of collegiate competition.  Division I institutions compete against each other in recruiting top talent by offering various benefits, such as scholarships, access to top tier training facilities and coaching staff, medical treatment, opportunities to compete at the highest collegiate level, exposure to scouts and other

recruiters, nationwide publicity, and the opportunity to negotiate NIL marketing deals and earn NIL compensation. This process is highly competitive. For example, less than 2.5% of high school baseball players will go on to compete in Division I athletics.[1] The NCAA recognizes that JUCO transfers are an important part of the Division I sports labor market, noting that "every year hundreds of talented JUCO players transfer to NCAA Division I four-year colleges around the country looking to make an impact."[2] However, as set forth below, the NCAA seeks to enforce anticompetitive rules that disproportionately affect Division I athletes who have competed at junior colleges.

The NCAA regulates and controls the Division I athletics labor market through the Bylaws published in its Division I Manual ("Bylaws"). (Compl. Ex. 1). The Bylaws are adopted and entered into by NCAA member institutions and interpreted and enforced by the NCAA. The relevant Bylaws in this case are as follows:

> **12.8    Seasons of Competition: Five-Year Rule**. A student-athlete ***shall not engage in more than four seasons of intercollegiate competition in any one sport*** (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:[3]

> **12.8.1    Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.

---

[1] *Estimated probability of competing in college athletics*, NCAA (April 1, 2024), https://www.ncaa.org/sports/2015/3/2/estimated-probability-of-competing-in-college-athletics.aspx.

[2] *College baseball's top 50 impact JUCO transfer hitters*, NCAA (Dec. 4, 2024), https://www.ncaa.com/news/baseball/article/2024-12-04/college-baseballs-top-50-impact-juco-transfer-hitters.

[3] For purposes of completeness, the entirety of Bylaw 12.8 is cited; however, Arbolida does not contend that Bylaw 12.8.1 and 12.8.1.1 prohibit him, specifically, from competing in a third year of Division 1 baseball. These Bylaws establish an eligibility clock in which athletes must complete their years of eligibility. Per the NCAA's Covid extension waiver, Arbolida has six years to complete his eligible years. Because Arbolida first enrolled in a collegiate institution in Fall 2019, his eligibility clock does not expire until Fall 2025.

**12.8.1.1 Determining the Start of the Five-Year Period**. For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4). when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum fulltime program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2).

**12.02.6 Intercollegiate Competition.** Intercollegiate *competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution* does any of the following:

(a)  Represents the institution in any contest against outside competition, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;

(b)  Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or

(c)  Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

**14.02.4 Collegiate Institution**. A collegiate institution (for purposes of NCAA legislation) is an institution of higher education that:

(a)  Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree;

(b)  Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or

(c)  Is located in a foreign country.

(emphasis added).

When viewed together, these Bylaws limit a college athlete's eligibility to four competitive seasons within five calendar years, which due to Covid-19 was extended to six calendar years for most athletes who competed in 2020, including Arbolida.[4] The athlete's eligibility clock starts

---

[4]  *2021 NCAA Division I COVID-19 Question and Answer Guide* (July 30, 2021), NCAA

running from the first day of classes of a term for which the athlete is registered at a "collegiate institution," and "collegiate institution" includes two-year junior colleges, but not post-secondary education institutions such as prep schools, even if such schools offer athletic programs. "Intercollegiate competition" includes athletic competition that occurs at a two-year junior college. Although junior colleges are considered "collegiate institutions" for purposes of determining an athlete's Division I eligibility, junior colleges are not governed by the NCAA and are not member institutions. Rather, junior colleges are primarily governed by the National Junior College Athletic Association ("NJCAA").

The NCAA's agreements with its member institutions are intended to be for the benefit of college athletes. The NCAA's stated purpose is to act in the best interest of the students and to coordinate and deliver safe, fair and inclusive competition directly and by member institutions.[5] Nevertheless, the NCAA profits substantially off the services that its athletes provide. In fact, the NCAA generated nearly $1.3 billion in revenue for the 2022-2023 year through various media rights and marketing deals tied to its championship athletic events.[6]

### B.    Challenge to the NCAA's Bylaws Paves the Way for NIL Compensation

In 2021, the Supreme Court issued a landmark ruling recognizing that the NCAA is subject to the Sherman Act for its restraints on trade and finding that certain Bylaws that limited the benefits college athletes could receive in exchange for their athletic services in the relevant market violated the Sherman Act. *Nat'l Collegiate Athletic Ass'n v. Alston,* 594 U.S. 69, 108 (2021) (Kavanaugh, J.,

---

https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19QAGuide.pdf.

[5] *Mission and Priorities,* NCAA, https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx#:~:text=Provide%20world%2Dclass%20services%20to,improves%20health%2C%20safety%20and%20performance.

[6] *NCAA generates nearly $1.3 billion in revenue for 2022-2023,* Associated Press (Feb. 1, 2024), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23.

concurring) ("the NCAA has long shielded its compensation rules from ordinary antitrust scrutiny the Court's decision marks an important and overdue course correction.").[7]

After the *Alston* decision, the NCAA abandoned its rules prohibiting college athletes from earning compensation on the use of their name, image, and likeness ("NIL").  Since then, college athletes have been permitted to earn NIL compensation, adding an inherently economic component to participation in college sports.  Meaningful NIL compensation is realistically only available for athletes competing at the Division I level.  Arbolida is illustrative of this fact, as he has received NIL opportunities and compensation only while competing at a Division I institution. (Arbolida Decl. ¶¶ 8–9).

Through its regulatory power and market control, the NCAA can arbitrarily and capriciously deny a college athlete the ability to participate in the economic, developmental and other benefits of the Division I athletics market based solely on the athlete's prior participation in JUCO sports, even though participation in JUCO sports does not offer the same benefits and opportunities as NCAA Division I sports.  College athletes have little recourse, though, because if an athlete desires to participate in the highest level of collegiate athletics, he or she has no real option but to enroll at an NCAA Division I institution and acquiesce to the NCAA's Bylaws.

### C.    Deigo Pavia Obtained an Injunction Enjoining the NCAA from Prohibiting His Competing in Division I Athletics Based on His JUCO Sports Participation

In November 2024, Diego Pavia, the quarterback for Division I Vanderbilt University, sued the NCAA, seeking injunctive relief from the same Bylaws at issue here.  *Pavia*, U.S. Dist. LEXIS 228736 at *8-11.  Pavia began his collegiate football career at a junior college in the Fall of 2020, where he played two seasons of JUCO football. *Id.*  His 2020 JUCO year was disregarded due to

---

[7] The relevant market in *Alston* was defined as "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *Alston*, 594 U.S. at 81.

Covid, while his 2021 JUCO year counted towards his NCAA eligibility. *Id*. After two years of JUCO football, Pavia transferred to New Mexico State, a Division I institution, where he played his 2022 and 2023 seasons. *Id*. Pavia then transferred to Vanderbilt University, where he played his 2024 season – his third year of Division I college football. *Id*.

The Bylaws, specifically Bylaw 12.02.6, count Pavia's JUCO football year against his Division I eligibility and, therefore, prohibit him from playing a fourth year of Division I football, even though other college athletes receive four years of Division I eligibility. Pavia sought injunctive relief on the grounds that the NCAA's adoption and application of its Bylaws is anticompetitive in nature and violates the Sherman Act. *Id*. at 11. The U.S. District Court for the Middle District of Tennessee found that Pavia is likely to succeed on his antitrust claim and consequently granted him a preliminary injunction, enjoining the NCAA from enforcing Bylaw 12.02.6 against him. *Id*. at *33-36. As a result of the injunction, Pavia is eligible to play a fourth year of Division I football at Vanderbilt in the Fall of 2025.

In the wake of the *Pavia* decision, the NCAA issued a Blanket Waiver to former JUCO athletes who used their final year of Division I eligibility during the 2024-2025 academic year, permitting them an additional year of Division I eligibility in the 2025-2026 academic year. This Blanket Waiver, while a step in the right direction, arbitrarily excludes former JUCO athletes like Arbolida who, despite using only *two* years of Division I eligibility, used his fourth year of NCAA eligibility during the 2023-2024 academic year.

### D.     The Facts Here are Virtually the Same as the Facts in *Pavia*

Arbolida's path to Division I baseball is nearly identical to Pavia's path to Division I football. Like Pavia, Arbolida started out at a junior college; Arbolida attended Orange Coast College ("OCC"), where he played three years of JUCO baseball. (Arbolida Decl. ¶ 1). His Spring 2020 season was disregarded due to Covid, but his Spring 2021 and Spring 2022 seasons each counted as

a year of NCAA eligibility.  (*Id.* at ¶¶ 1, 3).  After graduating from OCC, he enrolled at the University of Houston ("UH"), where he played two years of Division I baseball. (*Id.* at ¶ 4).  He now seeks to play his third year of Division I baseball at Kansas State University ("KSU").

Like Pavia, Arbolida enjoyed great success during his years of Division I competition. While at UH, Arbolida was a 2024 All-Big 12 Second Team selection  (Arbolida Decl. ¶ 4).  He set the UH single season slugging percentage record and led the team in home runs and batting average.  (*Id.*).  Also like Pavia, Arbolida's athletic success has created valuable NIL opportunities allowing him to earn NIL compensation while playing Division I baseball.  (Arbolida Decl. ¶ 9; Henington Decl. ¶4). If Arbolida is able to play a third year of Division I baseball in the Spring 2025 season, he has the potential to earn at least $50,000 in NIL compensation during the Spring 2025 season NIL compensation. (*Id.* at ¶ 9; Henington Decl. ¶ 4).

The only difference between Pavia's case and Arbolida's case is that Pavia used his fourth year of NCAA eligibility—and *third* year of Division I eligibility—in the 2024-2025 academic year, while Arbolida used his fourth year of NCAA eligibility—and his *second* year of Division I eligibility— in the 2023-2024 academic year.  This is a distinction without a difference for purposes of granting Arbolida's waiver request and request for injunctive relief.  The NCAA has already awarded a *fourth* year of Division I eligibility to athletes like Pavia and there is no basis to deny Arbolida a *third* year of Division I eligibility.

## III.    LEGAL STANDARD

To obtain injunctive relief under Fed. R. Civ. P. 65, Arbolida must clearly show "(1) [he] is substantially likely to succeed on the merits; (2) [he] will suffer irreparable injury if the injunction is denied; (3) [his] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (citing *Beltronics USA, Inc. v. Midwest Inventory Distrib.*, LLC, 562

F.3d 1067, 1070 (10th Cir. 2009)). To seek an injunction that alters the status quo, as is the case here, Arbolida must "'make a strong showing' both on the likelihood of success on the merits and on the balance of the harms." *State v. Environmental Protection Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021). To make this showing, Arbolida must demonstrate that his motion is supported by "the exigencies of the case." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Moreover, in showing a likelihood of success on the merits, a plaintiff is not required to demonstrate a likelihood of success on all claims." *See also, Winter v. Nat'l Resources Def. Council, Inc.*, 555 U.S. 7, 19n.4 (2008) (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint). Thus, while Arbolida contends that he is entitled to injunction relief on the basis of all claims set forth in his Verified Complaint, this Memorandum focuses on his antitrust claim. For the reasons set forth herein, Arbolida has met the standard for injunctive relief.

## IV.    ARGUMENT

Weighing the four factors outlined above, the Court should grant Arbolida a temporary restraining order and preliminary injunction and enjoin the NCAA from enforcing Bylaw 12.02.6 against Arbolida on the grounds that it violates the Sherman Act and enforcing it has caused and will continue to cause immediate and irreparable harm to Arbolida.

### A.    For the Same Reasons that Pavia Succeeded, Arbolida is Likely to Succeed on the Merits of His Claim that the NCAA's Enforcement of Its Bylaws as They Pertain to JUCO Years is Anticompetitive and Violates the Sherman Act

To succeed under Section 1 of the Sherman Act, a plaintiff must show that the defendant (1) participated in an agreement that (2) unreasonably restrains trade in the relevant market. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012); *see also Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003).

9

As a threshold issue, Arbolida must show that the eligibility Bylaws at issue are commercial in nature, because the Sherman Act only applies if the rule at issue is commercial in nature. *Cohlmia*, 693 F.3d at 1280; *see also Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n,* 388 F.3d 955, 958 (6th Cir. 2004). Following the Supreme Court's landmark decision in. *Alston,* courts have repeatedly acknowledged the commercial nature of the NCAA's Bylaws. *See Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 762 (E.D. Tenn. 2024); *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv- 238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) (finding the NCAA's argument that rules prohibiting student-athletes from accepting prize money are non-commercial eligibility requirements that are not subject to the Sherman Act was "unlikely to be successful"); *Ohio v. American Express Co.*, 585 U.S. 529, 591 (2018) (restrictions on a student-athlete's ability to play are a restraint on trade and subject to the Sherman Act). In fact, the *Pavia* Court considered the exact Bylaws at issue in this case and found that the Bylaws, which restrict the Division I eligibility of former JUCO athletes, are commercial in nature and subject to the Sherman Act. 2024 U.S. Dist. LEXIS 228736, at *16 ("[A]greements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature. And it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature.") (internal citations omitted).

Having determined that the Bylaws are commercial in nature, a Sherman Act analysis is required. To demonstrate a likelihood of success on his Sherman Act claim, Arbolida must show that the NCAA participates in an agreement that restrains trade in the Division I athletics market. The NCAA cannot deny that it participates in an agreement with its member institutions to adopt and enforce the eligibility Bylaws – a fact which it did not dispute in Pavia. *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *13 ("The parties do not dispute that  NCAA member institutions "participate

in an agreement" regarding the challenged rules.").

To determine whether the NCAA's enforcement of its Bylaws unreasonably restrains trade in the relevant market, the Court should apply the "rule of reason standard." *Alston*, 594 U.S at 81. The rule of reason standard requires that the Court conduct a "'fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'"" *Id*. While not a rigid test, the rule of reason analysis can be described as a three-step burden-shifting analysis. *Id*. at 97.

> The plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." Should the plaintiff carry that burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint." If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

*Id*. at 97. (internal citations omitted).

When conducting a rule of reason analysis, a court may approve or condemn a restraint in the "twinkling of an eye" with a "quick look." *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *19 (citing *Alston,* 594 U.S. at 97). As set forth below, when the rule of reason analysis is applied, Arbolida can show that he is likely to succeed on the merits of his Sherman Act claim.

### 1.    The Relevant Bylaws, Specifically Bylaw 12.02.6, Have a Substantial Anticompetitive Effect

Direct evidence of anticompetitive effect is "'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio*, 585 U.S. at 542 (citations omitted). Indirect evidence of anticompetitive effect is "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted). Arbolida has provided sufficient indirect evidence to carry his burden of showing that the Bylaws as adopted and enforced by the NCAA have a substantial anticompetitive effect. When the challenged restraints on trade are horizontal agreements, as is the case here, the definition

11

of the market need not be precise. *See, Pavia*, 2024 U.S. Dist. LEXIS 228736, at *20 ("The eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements.") (citing *American Express*, 585 U.S. at 543, n.7)).  Federal courts have recognized various labor markets with respect to Division I athletics and have repeatedly found that the NCAA has power and control over those markets.  *See Alston*, 594 U.S. at 81 (market for certain Division I athlete services); *Tennessee*, 718 F. Supp. 3d at 762 (market for Division I athletics); *Ohio*, 706 F. Supp 3d at 592 (labor markets within NCAA Division I college athletics are relevant antitrust markets); *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *21 ("There is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have "market power"); *Alston*, 549 U.S. at 109 (Kavanaugh, J., concurring) ("[The] NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power in the market for [college athlete services[.]").

There is also sufficient evidence that the Bylaws restricting the eligibility of certain Division I athletes harm competition.  The Bylaws, on their face, limit and restrain the Division I eligibility of students who attend a junior college regardless of whether they play a sport there. Specifically, JUCO attendees are limited to two or three years of Division I eligibility, while other athletes are permitted four years of Division I eligibility.  This forces athletes to attend NCAA institutions so they may enjoy a full four years of Division I eligibility and the associated benefits and NIL opportunities, even if junior college is a better choice for the athlete academically, athletically, or otherwise at that time.  It also forces junior colleges, which are not NCAA member institutions, to compete directly with Division I schools that offer NIL opportunities, nationwide exposure, and top tier coaching, training and competition.  Other courts have considered this same issue and found that NCAA Bylaws that restrict the eligibility of Division I athletes are an unreasonable restraint on trade. *See Pavia,* 2024 U.S. Dist. LEXIS 228736, at *25  (finding Bylaws 12.02.6 likely an unreasonable restraint on trade);

*Ohio,* 706 F. Supp. 3d at 594 (finding NCAA bylaw that barred athletes from competing until certain academic residency requirements are met restrained competition among NCAA institutions for transfer athletes, resulting in harm to Division I athletes and consumers).

Based on these facts, Arbolida can succeed on showing that the Bylaws at issue in this case, which restrict his Division I eligibility on account of his year of JUCO baseball, have a substantial anticompetitive effect in the labor market for Division I sports.

## 2.    Burden Shifts to NCAA to Show Procompetitive Rationale

Because Arbolida can show that the eligibility Bylaws as drafted and enforced by the NCAA have a substantial anticompetitive effect, the burden shifts to the NCAA to articulate a procompetitive rationale for the Bylaws. *Alston,* 594 U.S at 97. Based on the NCAA's position in prior legal actions, the NCAA is likely to argue that its eligibility Bylaws expand and improve the quality of output for Division I athletic services by preserving the uniqueness of student- athletes and enhancing the experiences of student-athletes. *See Pavia,* 2024 U.S. Dist. LEXIS 228736, at *26-31. The NCAA may also argue that the JUCO eligibility rules increase the number of students who participate in Division I sports and foster alignment between athletics and academics. *Id.* These arguments are not persuasive and have been previously rejected. *Id.*

Rather than foster alignment between athletics and academics, the current Bylaws foster an environment where students are forced to choose between academics and athletics. For example, an athlete enrolled at junior college may feel pressured to leave after his or her first year, before obtaining a degree, for fear of losing an additional year of Division I eligibility. This means high school graduates and transfer students may be choosing to enroll in Division I institutions to preserve their athletic opportunities, even though completing a junior college degree may be a better academic fit. The NCAA also broadly permits transferring among institutions which can hinder traditional degree progression.

Allegedly preserving the character of Division I athletics also does not provide a procompetitive justification for the eligibility Bylaws. The NCAA Bylaws already provide alternative playing options to athletes that do not affect their Division I eligibility, such as prep schools, and because playing JUCO sports is not a comparable experience to Division I athletics, allowing athletes to retain Division I eligibility while playing JUCO sports does not harm the character of Division I athletics. The *Pavia* Court recognized the illogic of the NCAA Bylaw that permits a JUCO team and prep-school team to compete against one another and, per the Bylaws, only the athletes on the JUCO team would be docked a year of eligibility for participation. 2024 U.S. Dist. LEXIS 228736, at n.9 ("This illustration further illustrates the illogic of the NCAA's rule concerning eligibility afforded to former junior college players.").

Evan assuming the NCAA could put forth some valid reasons why its eligibility Bylaws have an alleged procompetitive rationale, which it cannot, these alleged goals can easily be established through less restrictive alternatives, as set forth below.

### 3.    Less Restrictive Alternatives Exist to Accomplish Any Procompetitive Rationale

Arbolida seeks to implement the same less restrictive alternatives proposed by Pavia. Specifically, Arbolida proposes that Bylaws 12.8.1, 12.8.1.1 and 12.02.6 be revised such that an athlete's eligibility begins to run when an athlete first registers as a full-time student at "an NCAA member institution" instead of when the athlete registers at a "collegiate institution." The change would similarly include revising the definition of "intercollegiate competition" to cover competition as part of "an NCAA member institution," rather than competition as part of a two- year school. These changes would permit college athletes more freedom in choosing their collegiate athletics path without restraining their Division I eligibility. At the same time, the revised Bylaws would still foster degree progression by allowing athletes four full years of Division I participation, which tracks with traditional degree progression more than the two or three years of eligibility to which former JUCO

14

athletes are currently limited. The *Pavia* Court recognized that these proposed revisions to the Bylaws provide a less restrictive alternative that eliminates the anticompetitive harms currently present while still furthering procompetitive goals. 2024 U.S. Dist. LEXIS 228736, at *32-33.

Applying similar facts and identical law, the *Pavia* Court ultimately concluded in the "twinkling of an eye," that Pavia had a strong likelihood of succeeding on the merits of his Sherman Act claim because the NCAA Bylaws affecting Pavia – and now Arbolida – are an unreasonable restraint on trade with anticompetitive effects, for which a less restrictive alternative is available. 2024 U.S. Dist. LEXIS 228736, at *33-36. Arbolida has made the same showing.

**B.    Arbolida is Suffering and Will Continue to Suffer Substantial, Immediate and Irreparable Harm if Injunctive Relief is Not Granted**

As set forth herein, Arbolida will suffer substantial, immediate and irreparable harm if the NCAA is not enjoined from enforcing Bylaw 12.02.6 against him. Irreparable harm is harm that is "certain, great, actual, and not theoretical." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). The movant must show "the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm," and a significant risk that such harm cannot be remedied with monetary damages after the fact. *Schrier*, 427 F.3d at 1267 (citing *Heideman*, 348 F.3d at 1189); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citing *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

Absent injunctive relief, Arbolida will suffer immediate harm. KSU plays the opening game of its Spring 2025 season on February 14, 2025. (Hughes Decl. ¶ 5). While Arbolida will be a key contributor to the team, KSU cannot hold its team planning in limbo while a potentially lengthy legal process plays out. (*Id.* at ¶ 5). Without immediate injunctive relief, KSU will have to proceed with planning and preparing for the season as if Arbolida were ineligible. (*Id*. at ¶ 5). The longer Arbolida

is without injunctive relief, the more difficult it will be for KSU to incorporate him into the team's ongoing games and related preparations. (*Id*. at ¶ 6). Additionally, because enrollment for the Spring 2025 semester has closed and classes have begun, transferring to a non- Division I institution for the Spring 2025 season is not an option for Arbolida. (Arbolida Decl. ¶ 11). And, because Arbolida's eligibility clock expires after the Spring 2025 season, he would be ineligible to play collegiate baseball at any member institution in the Spring of 2026 – the season for which the NCAA has arbitrarily granted other former JUCO athletes a Blanket Waiver. In essence, if injunctive relief is not granted, Arbolida will have no opportunity to play collegiate baseball.[8]

Furthermore, the loss of Arbolida's current Division I baseball opportunity would be substantial and irreparable. Arbolida has the rare opportunity to play Division I Big 12 baseball as a member of a team ranked in the top 25 during the 2024 season under the coaching of the winningest active Big 12 head baseball coach. (Hughes Decl. ¶¶ 1-2). Losing this opportunity – which non-JUCO athletes would not be at risk of losing – would result in the loss of numerous benefits, including, but not limited to, the loss of consumer and scouting exposure, the loss of the potential to increase his draft prospects, and the loss of the ability to further develop his baseball skills. *See Ohio*, 706 F. Supp. 3d at 597 ("Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") (collecting cases). In addition, Arbolida will lose the opportunity to further build his brand and to capitalize off his NIL while his marketability is at its highest. (Henington Decl. ¶ 4; Arbolida Decl.¶¶ 8–9). Arbolida is coming off a successful year at UH, and every Division I game in which he competes provides the unique opportunity to increase his marketability and thus increase his potential NIL earnings. These opportunities are simply not available at non-Division I institutions, and monetary damages simply cannot remedy Arbolida's

---

[8] The NCAA's lack of response to his waiver request has contributed to the urgency of Arbolida's need for injunctive relief.

inability to take advantage of the aforementioned opportunities. For these reasons, Arbolida has shown that he will suffer immediate and substantial irreparable harm if injunctive relief is not granted.

      **C.**    **The Balance of Equities Favors Granting Injunctive Relief to Arbolida Because Any Potential Harm to the NCAA or Others Would Be Negligible and Outweighed by the Substantial, Immediate and Irreparable Harm that Arbolida Would Suffer if Injunctive Relief is Not Granted.**

The balance of equities also supports granting Arbolida injunctive relief. Here, the potential harm faced by the NCAA or others by granting Arbolida injunctive relief is negligible. After all, the injunctive relief Arbolida seeks would simply require the NCAA to comply with federal antitrust laws. Courts in other circuits have found that such compelled compliance with federal law cannot constitute harm. *See, e.g., Calvert Health, LLC v. Four Leaf Liquidators, LLC*, 3:23-cv-00110, 2024 WL 69953, at *10 (M.D. Tenn. Jan. 5, 2024). Moreover, enjoining enforcement of an NCAA bylaw does not cause the NCAA harm. *Ohio*, 706 F. Supp 3d at 600 ("A prohibition on enforcing the [transfer bylaw at issue in that case] causes no harm to the NCAA or any other entity or individual. Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing student-athletes to compete in athletic events already scheduled to take place."). Additionally, permitting Arbolida to participate in the Spring 2025 baseball season would not open a "floodgate" of other waiver requests, because the number of affected athletes is limited to those individuals who are currently enrolled in a Division I institution and are members of a Spring 2025 sports team. In stark contrast, the harm to Arbolida if injunctive relief is denied would be substantial and irreparable, as set forth in Section B above. Accordingly, the balance of equities favors granting Arbolida's request for injunctive relief.

      **D.**    **Granting Arbolida's Request for Injunctive Relief will Serve the Public Interest**

Granting Arbolida's request for a temporary restraining order and preliminary injunction would also serve the public interest in promoting free and fair competition in labor markets

guaranteed by the antitrust laws. The requested injunction is narrow in scope and would permit Arbolida to compete in the Spring 2025 baseball season for a member institution at which he is already enrolled. In addition, because the NCAA has already granted a Blanket Waiver to JUCO athletes seeking to compete in the 2025-2026 academic year, it cannot, in good faith, claim that the public would be harmed by extending that waiver to a smaller number of former JUCO athletes who are competing in their third year of Division I eligibility this Spring.

<strong>V.    CONCLUSION</strong>

For the reasons set forth herein, in Arbolida's Motion, and in the supporting declarations attached hereto, Arbolida respectfully requests that the Court grant his Motion for Temporary Restraining Order and Preliminary Injunction and enter a temporary restraining order and subsequent preliminary injunction, restraining and enjoining the NCAA from enforcing Bylaw12.02.6 against Arbolida so that Arbolida is eligible to compete in Division I baseball for the Spring 2025 season, and restraining and enjoining the NCAA from enforcing Bylaw 12.11.4.2 against Arbolida or KSU such that Arbolida can reap the benefits of this injunctive relief without being subjected to retaliatory punishment.

**KENNYHERTZ PERRY, LLC**

*/s/ Milton Winter*
Milton Winter, KS Bar # 28776
Braden Perry, KS Bar # 21022
Kristen Andrews, KS Bar # 30066
2000 Shawnee Mission Pkwy Ste. 210
Mission Woods, KS 66205
(816) 527-9447
mit@kennyhertzperry.com
braden@kennyhertzperry.com
kristen.andrews@kennyhertzperry.com

**Attorneys for Plaintiff Cary Arbolida**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 14, 2025, a true and correct copy of the foregoing Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*/s/ Milton Winter*
Milton Winter, KS Bar # 28776