**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CARY ARBOLIDA, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) CASE NO. 2:25-cv-02079-JWB-BGS |
| v. | ) |
| | ) |
| | ) |
| NATIONAL COLLEGIATE | ) |
| ATHLETIC ASSOCIATION, | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Cary Arbolida ("Plaintiff") filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction (the "Motion") in this action on February 14, 2025.  On February 18, 2025, the Court set an hearing on Plaintiff's Motion for February 20, 2025.  Although the NCAA has not been served, the NCAA responds by filing its Opposition to Plaintiff's Motion for TRO.[1]  The NCAA respectfully submits that Plaintiff's request for a TRO should be denied as Plaintiff cannot and has not met the high standard that is required.  Plaintiff has failed to establish not only irreparable harm, but also the other required elements under Tenth Circuit precedent detailed below.  Additionally, the NCAA believes that more time for full briefing and a preliminary injunction hearing is appropriate for this case in order for the Court to hear all relevant evidence.  The NCAA opposes Plaintiff's requested relief at this time as follows.

## PRELIMINARY STATEMENT

Kansas State University ("KSU") is Plaintiff's fifth collegiate institution.  He has collectively

---

[1] *See, e.g., Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1229 (10th Cir. 2006) ("Service of a summons is a means of establishing a court's jurisdiction over a defendant"); *Williams v. Gordon*, No. 2:24-CV-104-KHR, 2024 WL 4406914, at *2 (D. Wyo. Aug. 26, 2024) ("[P]roper summons and effective service of that summons are prerequisites for personal jurisdiction.").

already participated in five collegiate baseball seasons for Orange Coast College [2019-20, 2020-21, and 2021-22]; and the University of Houston ("Houston") [2022-23 and 2023-24]),[2] and received degrees from both of those schools.  Recognizing his eligibility to participate in Division I baseball had been exhausted, Plaintiff transferred from Houston to the University of Tampa ("Tampa"), a Division II school, following the Spring 2024 season.  Now, months later, Plaintiff seeks to invoke this Court's emergency equitable powers because he has decided to leave Tampa—where he had joined the Division II baseball team intending to play—mid-semester to try to play another season of Division I baseball for KSU, which is in the same athletic conference as Houston.  Plaintiff contends that frustration of his desire to play two additional collegiate baseball seasons in Division I, constitutes an antitrust violation pursuant to the Sherman Act that requires immediate action from this Court.

While Plaintiff asserts that he needs this Court to act quickly to avoid irreparable harm to him, he omits that over seven months ago, on or about June 27, 2024, while playing baseball for the Houston, Houston submitted a season of competition waiver request on Plaintiff's behalf, based upon the identical facts here.  That waiver request was denied.  Declaration of Jerry Vaughn ("Vaughn Decl."), ¶¶ 3-4, Ex. A.  Plaintiff did not pursue an administrative appellate remedy at that time.  Nor did he pursue legal action at that time to challenge the rules he seeks to invalidate now.  Instead, he elected to sit on his rights, transfer to Tampa and then join its baseball team, and then transfer to KSU, apparently to take another bite at the eligibility apple.  As demonstrated below, Plaintiff cannot satisfy *any* of the elements necessary to shoulder his onerous burden to obtain a TRO.  The reality is that Plaintiff transferred to KSU, knowing he was ineligible to play at KSU under the rules thousands of other Division I student-athletes play by.  Plaintiff now claims he will suffer "irreparable harm" if he

---

[2] The Division I membership issued a blanket waiver for the COVID-impacted Spring 2020 season, by which the Spring 2020 season does not count against a student-athletes four permissible seasons of intercollegiate competition under the NCAA Division I's Five-Year Rule.  *See* Division I Bylaw 12.8.  The Five-Year Rule provides that a student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport, and that the four seasons of competition shall be completed within five years.  *Id.* at Bylaws 12.8 and 12.8.1.  Accordingly, Plaintiff's 2019-20 season does not count against his available four seasons of competition or five years of eligibility to complete those seasons.

does not get to play another season of Division I baseball and potentially receive money for the use of his Name Image and Likeness ("NIL").

Another fatal flaw in Plaintiff's Motion and his requested injunctive relief is its complete absence of a relevant market analysis specifically pertaining to Division I baseball. Instead of providing this Court with the required factual record of a market analysis regarding Division I baseball, which is required in order to establish a likelihood of success in establishing an antitrust violation, Plaintiff relies on cases that involve an analysis of a completely different market regarding Division I football. Division I football differs from Division I baseball in a myriad of ways including: revenue generated, potential and avenues to be drafted, options to play at various collegiate levels, opportunities for exposure and selection by professional teams, and in the competition between NCAA baseball and the myriad of levels of professional baseball.

Plaintiff premises his claim upon the recent unpublished District Court opinion from the Middle District of Tennessee, *Pavia* decision. That reliance is misplaced because (1) Plaintiff's factual position is materially different; (2) the NCAA believes *Pavia* was wrongly decided and has appealed that decision; and (3) *Pavia*, as well as other recent cases, involved different NCAA eligibility questions, which depended upon the unique facts of each such case.[3]

Plaintiff's Motion for immediate equitable relief that could impact the status quo across NCAA Division I collegiate athletics should be denied for at least three reasons. First, Plaintiff cannot establish that he would face irreparable harm if this case were litigated fully on the merits, rather than on this sparse record and expedited timeline. Second, Plaintiff cannot make a clear showing that he is likely to prevail on the merits. And third, the balances of equities and public interest counsel against

---

[3] *See e.g., Pavia v. Nat' Collegiate Athletic Ass'n*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024) (denying plaintiff's TRO because "the Court is not persuaded that an ex parte order is justified," but granting plaintiff's motion for preliminary injunction); *Wade v. NCAA,* No. 2:24-cv-196-TBM-RPM, 2024 U.S. Dist. LEXIS 232129, at *5–6 (S.D. Miss. Dec. 23, 2024) (denying plaintiff's motion for TRO); *Brantmeier v. NCAA*, No. 1:24-CV-238, 2024 U.S. Dist. LEXIS 182251, at *3–4 (M.D.N.C. Oct. 7, 2024) (denying plaintiff's motion for preliminary injunction).

issuing sweeping relief absent any economic analysis—and on a deficient record—in the middle of the academic year, as demonstrated by multiple courts throughout the country recently denying TROs and consistently permitting full briefing on a motion for preliminary injunction.[4]

## **LEGAL STANDARD**

"Preliminary relief—whether in the form of a TRO or a preliminary injunction—'is an extraordinary remedy, the exception rather than the rule.'" *Uhlig LLC v. CoreLogic, Inc.*, No. 21-2543-DDC-GEB, 2021 WL 5758564, at *2 (D. Kan. Dec. 3, 2021) (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)). Because a TRO is an extraordinary remedy, "the right to relief must be clear and unequivocal." *Lenhardt v. City of Mankato, Kansas*, No. 18-4151-SAC-KGG, 2019 WL 1585027, at *1 (D. Kan. Apr. 12, 2019) (quoting *Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (citations omitted)). In order to obtain a TRO, a plaintiff must establish: "(1) that it will suffer an irreparable injury absent an injunction; (2) that the threatened injury outweighs the harm an injunction may cause the opposing party; (3) that an injunction would not be adverse to the public interest; and (4) that it is substantially likely to prevail on the merits." *EPRO Servs., Inc. v. Regenesis Bioremediation Prods.*, No. 19-1220-EFM, 2019 WL 4054030, at *2 (D. Kan. Aug. 28, 2019) (citing *State of Utah v. Babbitt*, 137 F.3d 1193, 1200 n. 7 (10th Cir. 1998)); *see also First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (listing same elements a plaintiff is required to show to be entitled to a preliminary injunction).

Courts have consistently held that a showing of probable irreparable harm is the "single most

---

[4] *See Wade,* 2024 U.S. Dist. LEXIS 232129, at *5–6 (denying motion for TRO); *Fourqurean v. NCAA*, No. 3:25-cv-00068-wmc (W.D. Wisc.) (Min. Order, ECF No. 8) (consolidating requests and setting briefing schedule); *Pavia*, No. 3:24-cv-01336 (M.D. Tenn.) (ECF No. 15) (denying motion for TRO); *see also State of Tennessee v. NCAA,* No. 3:24-cv-00033-DCLC-DCP (E.D. Tenn.) (ECF No. 16) (combining proceedings on TRO and preliminary injunction); *See Ciulla-Hall v. National Collegiate Athletic Association ("NCAA"),* No. 25-CV-10271-DJC, 2025 WL 438707, at *2 (D. Mass. Feb. 7, 2025) (denying TRO); *Goldstein v. National Collegiate Athletics Association*, 3:25-cv-00027-TES (M.D. Ga. Feb. 19, 2025) (ECF. No. 16) (denying TRO).

important prerequisite" for the issuance of a TRO.  *See Uhlig*, 2021 WL 5758564, at*2; *see also Malamed*, 874 F.3d at 1141.  Proving irreparable harm is not "an easy burden to fulfill."  *Malamed*, 874 F.3d at 1141 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  "To constitute irreparable harm, an injury must be certain, great, actual, 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  A party seeking interim relief establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258).

A claim of "[p]urely speculative" harm does not suffice; instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden.  *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1258).  Without carrying his burden to demonstrate the existence of an irreparable injury, Plaintiff is respectfully not entitled to his sought relief.  Plaintiff has not done so at this stage and on the truncated record before the Court.  Accordingly, the Court should decline to enter his requested TRO.

## ARGUMENT

The NCAA requests that the Court deny Plaintiff's request for TRO and permit sufficient time for full briefing and hearing on Plaintiff's request for preliminary injunction.  As Plaintiff highlights in his Motion, his request for affirmative injunctive relief preventing the NCAA from enforcing Division I Bylaw 12.02.6 is not procedurally unique.  Specifically, Plaintiff cites to a recent case where this particular Bylaw was challenged by another student-athlete.  *See Pavia*, 2024 U.S. Dist. LEXIS 228736 (denying Plaintiff's TRO because "the Court is not persuaded that an ex parte order is justified.").  Those similarities, however, are not helpful to Plaintiff.  That is because when that rule has been challenged in the past, presiding courts have permitted full briefing, whether by

consolidating proceedings on the request for a TRO and preliminary injunction, or by denying the *ex parte* motion for TRO and thereafter setting a fulsome briefing schedule.[5]  The NCAA requests this Court follow suit for several independent reasons.

## I. <u>*First*</u>, the Courts Disfavor Plaintiff's Requested Relief Because It Seeks to Modify, Rather Than Preserve, the Status Quo.

The purpose of a TRO is to preserve the status quo until a motion for preliminary injunction can be heard.  *Geiger v. Espy*, 885 F. Supp. 231, 233 (D. Kan. 1995).  Requests for interim injunctive relief that "alter the status quo," like that here, are "specifically disfavored" and "must be more closely scrutinized."  *Schrier v. Univ. Of Co.,* 427 F.3d 1253, 1259 (10th Cir. 2005) (citations and internal quotation marks omitted); *see, e.g., Doe v. Tennessee*, No. 3:18-cv-0471, 2018 U.S. Dist. LEXIS 184091, at *8 (M.D. Tenn. Oct. 26, 2018); *Brantmeier*, 2024 U.S. Dist. LEXIS 182251, at *3–4 ("Ms. Brantmeier is 'not asking the Court to maintain the status quo until after a trial and final judgment, which is the traditional function of a preliminary injunction.'  Instead, she seeks an order altering the status quo.  Such '[m]andatory preliminary injunctions are 'warranted only in the most extraordinary circumstances.'") (internal citations omitted) (quoting *Pierce v. N.C. State Bd. of Elections,* 97 F.4th 194, 209 (4th Cir. 2024)).

Plaintiff's request for a TRO does not ask the Court to preserve the status quo; rather, it asks the Court to order a change to the status quo by granting Plaintiff, individually, two additional seasons of competition to play Division I baseball, under rules that apply equally to hundreds of thousands of Division I student-athletes across the country.  Both the *Pavia* and *Wade* Courts reasoned that such requests warrant denial of *ex parte* relief.  *See Pavia*, No. 3:24-cv-01336 (M.D. Tenn.) (ECF No. 15, at 2) ("the Court is not persuaded that an ex parte order is justified.  This is particularly the case here where the Plaintiff seeks prospective injunctive relief, not merely preservation of the status quo.");

---

[5] *See* Footnote 2 above.

6

*Wade*, 2024 U.S. Dist. LEXIS 232129, at \*5–6 ("where the Middle District of Tennessee did not find that the status quo should be changed . . . Wade falls even shorter of meeting those burdens.  Again, as noted before, it is Wade who is seeking to change the status quo.").

II.    <u>*Second*</u>, **Plaintiff Cannot Meet His Burden to Demonstrate a Likelihood That He Will Suffer Irreparable Harm Absent Issuance of a TRO.**

  A.    **Plaintiff's Delay in Seeking the Instant Relief Weighs Against a Finding of Irreparable Harm.**

Undue delay in bringing a request for injunctive relief militates against a finding of irreparable harm.  *Lenhardt*, 2019 WL 1585027, at \*1 (finding that "plaintiff's delay in seeking [a TRO's] equitable relief weighs against her claim of urgency").  At least one district court within the Tenth Circuit denied a motion for preliminary injunction, let alone a TRO, because plaintiffs were aware of the alleged effects for nine months prior to suing and "[a] long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."  *See Alaska v. United States Dep't of Educ.*, 739 F. Supp. 3d 873, 894 (D. Kan. 2024) (quoting 11A Mary Kay Kane et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2024)).

Plaintiff's claim that time is of the essence is belied by his own delay in bringing this action.  Importantly, this is not Plaintiff's first attempt to waive Division I's clear eligibility requirements as they apply to him.  Before leaving Houston in 2024, Houston, on Plaintiff's behalf, submitted an identical waiver request to the NCAA requesting an additional season of competition for Plaintiff to play the Spring 2025 season for Houston.  Vaughn Decl. ¶ 3.  But the waiver request was denied, consistent with eligibility rules adopted by the Division I membership that apply uniformly to all Division I student-athletes.  *Id.* ¶ 4.  Thus, Plaintiff's ability to seek his requested relief is not a recent development.  Rather, his challenge was ripe far earlier, no later than October 2024, when Houston's waiver request was denied and Plaintiff knew that Division I eligibility rules prohibited him from

playing two additional seasons of Division I baseball.  (See Verified Compl. ¶ 34).  Notably, Plaintiff fails to mention his submission of an identical waiver request anywhere in his Complaint, Motion, or supporting briefs and declarations.  Nor does Plaintiff concede that this prior waiver request was denied months ago and was not appealed.  Vaughn Decl. ¶¶ 4-5.

It was only after the recent *Pavia* decision that Plaintiff transferred to KSU, submitted an identical waiver request, and then filed this Motion for another chance at Division I eligibility.  *Id.* ¶¶ 6-7.  Plaintiff did not expeditiously move for injunctive relief.  Rather, his voluntary delay has manufactured the urgency for which he bases his belated request, waiting until well past he exhausted his Division I eligibility—and until the first day of the start of the 2025 Spring season for which he now seeks additional eligibility—to file his instant Motion.  (Hughes Decl. ¶ 5).

Other student-athletes who have recently brought similar challenges in the interim—including Mr. Pavia and Mr. Fourqurean—raised their claims during or immediately after their final season of eligibility.  Plaintiff did not.  He completed his final season of Division I eligibility at Houston in Spring 2024, entered the 2024 Major League Baseball ("MLB") draft, was not selected, transferred to a Division II institution and, only presumably after seeing the recent case brought by Mr. Pavia,[6] decided to try his luck at bringing a similar lawsuit. (See Arbolida Decl. ¶¶ 4–5); (Verified Compl. ¶¶ 32–36).

Plaintiff cannot manufacture the requisite irreparable harm by choosing to delay filing suit.  Similar delays also proved persuasive to the *Pavia*, *Wade*, and *Sanchez* Courts in denying similar relief.  *See Pavia*, No. 3:24-cv-01336 (M.D. Tenn.) (ECF No. 15, at 2) ("Given that Plaintiff has almost certainly been aware of the challenged bylaws and his ineligibility to play college football in the 2025-26 season for quite some time and has been discussing possible resolution with the NCAA,

---

[6] This unreported decision from another district court has been appealed by NCAA and is currently pending before the Sixth Circuit.

the Court is not persuaded that an ex parte order is justified."); *Wade*, 2024 U.S. Dist. LEXIS 232129, at *5–6 ("Wade's dispute with the NCAA over his eligibility for the 2024-25 basketball season dates back to at least July.  Given that this dispute with the NCAA has been ongoing, it would be improper for this Court to grant an *ex parte* order without giving the NCAA an opportunity to be heard.") (internal citation omitted); *Sanchez v. NCAA*, No. 1:25-CV-00062-CEA-DCP (E.D. Tenn. Feb. 13, 2025) (ECF No. 16) (denying TRO).  Here, Plaintiff has delayed even longer, and the Court should reject Plaintiff's request for TRO accordingly.

> **B.      Plaintiff Has Not Met His Evidentiary Burden to Prove That Any Potential Delay in Issuance of Injunctive Relief—While the Parties Brief and Argue His Request for Preliminary Injunction—Will Cause Him Irreparable Harm.**

To establish his right to a TRO under Rule 65(b) of the Federal Rules of Civil Procedure, Plaintiff must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1132 (D.N.M. 2020).  Again, this showing is indispensable.  If Plaintiff fails to carry his burden, the Court's inquiry ends there.  *See New Mexico Cattle Growers' Ass'n v. United States Forest Serv.*, No. CIV 23-0150 JB/GBW, 2023 WL 2185698, at *3 (D.N.M. Feb. 22, 2023) ("A moving party must 'establish that . . . he is likely to suffer irreparable harm in the absence of preliminary relief.'") (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (internal citations omitted).

Here, Plaintiff alleges that he will not be able to compete for two additional seasons of Division I baseball if a TRO is not immediately granted.  Plaintiff does not, however, provide any evidence that missing a small handful of games prior to a preliminary injunction hearing—likely to number in the single-digits—of a fifty-six game regular season will cause him irreparable harm.  To wit, the Hughes Declaration indicates that, if Plaintiff's eligibility remains uncertain, "the further into the season it is, the more difficult it will be to incorporate him into the team's ongoing games and related preparations," (Hughes Decl. ¶ 6, Ex. 2 to Mot. TRO, ECF No. 4-2), which suggests that a

delay of short duration to permit complete briefing and argument would not cause the purported harm. Coach Hughes does not say that Plaintiff's failure to play baseball immediately removes his ability to play in a few weeks. In fact, he says the exact opposite.

C.    **Plaintiff Will Not Suffer Any Irreparable Harm if Denied Any Form of Injunctive Relief, Let Alone Interim Relief Through His Sought TRO.**

In his brief, Plaintiff identifies three conditions that he contends create irreparable harm. First, he argues that the KSU baseball team will be "in limbo" if his eligibility is not clarified. (Memo. at 15, ECF No. 7). Second, he contends that "if injunctive relief is not granted, [he] will have no opportunity to play collegiate baseball." (*Id*. at 16). Third, he contends that losing the opportunity to play for KSU will create myriad harms, including, "the loss of numerous benefits, including, but not limited to, the loss of consumer and scouting exposure, the loss of the potential to increase his draft prospects, [] the loss of the ability to further develop his baseball skills . . . . [and the loss] to further build his brand and to capitalize off his NIL [name, image, and likeness] while his marketability is at its highest." (*Id*.). The first two harms identified should be wholly rejected for three reasons.

First, KSU's ability to prepare for the season with clarity is purported harm to KSU, not Plaintiff, and therefore does not support Plaintiff's request for a TRO. Second, Plaintiff's ability to play intercollegiate baseball in the future does not require interim injunctive relief, and certainly not before a preliminary injunction hearing. An injunction is not necessary to prevent that asserted harm. It is reparable. If Plaintiff prevails at trial, he will be in functionally the same position in which he now asks the Court to place him via injunctive relief.[7] Third, Plaintiff's offered list of hypothetical but unspecified lost opportunities is not irreparable. Plaintiff's argument is primarily focused on an alleged diminution in his ability to generate professional earnings, which he hopes to achieve through

---

[7] Plaintiff's argument likewise ignores the fact that he has played collegiate baseball at multiple levels for the previous five seasons.

another[8] intercollegiate baseball season at Division I. This argument has two fundamental flaws.

First, Plaintiff's Motion lacks any evidentiary support. Plaintiff provides no evidence in the record that two additional seasons of Division I intercollegiate baseball will increase the likelihood that he will become a professional baseball player. The record indicates that Plaintiff has already played five seasons of intercollegiate baseball, with two at an Autonomy institution,[9]—including being an All-Big 12 Second Team selection, setting Houston's single-season slugging percentage record, and leading the team in home runs and batting average—but went undrafted. (See Arbolida Decl. ¶ 4). This suggests that his claims of being a draftable prospect in the future are too speculative.

Second, the harm articulated is not irreparable. In fact, the harm is monetary, capable of being modeled by economic experts and is therefore, by definition, reparable.

Plaintiff then goes on to say that losing his ability to earn NIL opportunities qualifies as irreparable harm. The opposite is true. Plaintiff "would be able to earn at least $50,000 in NIL compensation if he is able to play Division I baseball at KSU in the Spring 2025 season." (Verified Compl. ¶ 40). Ryan Henington suggests in his declaration that such opportunities are known to and would be procured by "Wildcat Creative," the NIL collective for KSU. (See Henington Decl. ¶ 4, Ex. 3 to Mot.). In other words, he knows exactly what amounts of money he could receive if he is permitted to play additional seasons of Division I baseball. "To show [a threat of irreparable harm], a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *Cypress Media*, 2020 WL 528449, at *4 (quoting *RoDa Drilling*, 552 F.3d at 1210). Plaintiff does not provide any evidence, through either himself or Mr. Henington, of additional NIL opportunities he could realistically expect to achieve during the baseball season. The existence of such future opportunities are only speculative, which does not

---

[8] Plaintiff played three seasons for Orange Coast Community College (2020, 2021, and 2022) and two seasons for Houston (2023 and 2024).

[9] Autonomy is a governance designation for certain conferences competing at the highest levels of Division I.

support a claim of irreparable harm. *Uhlig*, 2021 WL 5758564 ("A claim of 'purely speculative' harm does not suffice; instead, a plaintiff must show that 'significant risk of irreparable harm' is present to meet the burden.") (quoting *Greater Yellowstone*, 321 F.3d at 1258).

It cannot be the case that all eligibility rules—including GPA requirements, course requirements, etc.—irreparably harm student-athletes who do not comply with the rules adopted by the member schools. But that is the natural outcome of Plaintiff's argument, and his inability to tailor his requested injunctive relief to a specific harm, as opposed to general loss of additional eligibility that is not contemplated by the rules, necessitates this Court's denial of Plaintiff's requested TRO.

III.    ***Third***, **Plaintiff Cannot Meet His Burden to Demonstrate a Likelihood of Success on the Merits. His Argument Seeks to Bootstrap His Case to One About Intercollegiate Football, but the Market for Intercollegiate Baseball Is Fundamentally Different and Requires a Distinct Market Analysis, Which Plaintiff Has Not Provided.**

Plaintiff acknowledges that his antitrust claim should be evaluated under the "rule of reason standard," (Memo. at 11), and that, under the rule of reason, he needs to provide "'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality *in the relevant market*." (*Id.* (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)) (emphasis added).

Yet, in spite of that recognition, he pleads no specific facts supporting the existence of a relevant antitrust market for services of Division I baseball players and asks the Court to simply assume that the product markets found in other cases involving collegiate football players will suffice to carry his burden here. (*See* Memo. at 12–13). But material differences between opportunities available to baseball players as opposed to football players (or other student-athletes) invalidates that assumption—leaving Plaintiff's claim for relief lacking on a critical element of his antitrust claim. Relevant antitrust markets are defined around reasonable substitutes for the product at issue. *See Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 187 (10th Cir. 2025). As Plaintiff himself acknowledges when he noted that he was not selected in the

2024 MLB draft, (Verified Compl. ¶ 33), professional baseball, including several levels of minor league baseball employing hundreds of baseball players, provides opportunities to baseball players that are unavailable to football players after graduation.  There are also non-NCAA opportunities for baseball players like JUCO and entering the minor leagues straight out of high school; these opportunities are quite different out of high school when contrasted with football.  All of this would be part of an economic analysis that the NCAA is requesting time to develop before a full hearing.

In light of just this handful of significant differences between collegiate baseball and collegiate football, and on the sparse record before the Court, the NCAA requests that the Court reject Plaintiff's invitation to simply adopt the relevant product market found in other unrelated cases or presume that Plaintiff is likely to succeed in establishing the existence of a market for Division I baseball in which the NCAA has market power.  *See Ciulla-Hall*, 2025 WL 438707, at *2 (D. Mass. Feb. 7, 2025) (denying TRO because "[t]he Court presently lacks the factual record necessary to perform such an analysis," and plaintiff has not "demonstrated a substantial likelihood of success on his claim that NCAA restrictions constitute a per se violation of Section 1 of the Sherman Act.") (internal citations omitted).

The NCAA has additional arguments on the merits—including that the rules do not harm competition (because harm to a single competitor is not the same as market-wide harm, and the rules in fact increase output and opportunity, *see Brantmeier*, 2024 U.S. Dist. LEXIS 182251, at *14 (refusing to enjoin eligibility rules governing acceptance of prize money in non-NCAA competitions above actual and necessary expenses, holding plaintiff's "evidence of harm to competition from the [challenged] rules is remarkably thin" and "harm to a few elite 'consumers' is [not] by itself sufficient to show harm to competition.")); that there are procompetitive benefits to the rules; and why Plaintiff's suggested less restrictive alternatives are unwarranted here—but the NCAA does not have adequate time to brief these arguments in advance of an expedited TRO hearing.  If the Court is

inclined to grant any form of relief, the NCAA should receive the opportunity for full briefing to articulate its arguments in the preliminary injunction context rather than being unfairly enjoined.

## IV. _Fourth_, the Balance of Equities Weighs Against Issuance of an Injunction.

This case should not be viewed in a vacuum.  While it is a single-plaintiff case, the fallout from _Pavia_ indicates that with each successfully obtained injunction comes a new challenge to the NCAA's member schools' adopted eligibility rules.  Those rules impact the opportunities available to over 180,000 Division I student-athletes.  The equities counsel against decisions concerning NCAA eligibility rules, with such sweeping implications, issuing on an expedited basis and truncated record. _See, e.g., Bewley v. NCAA,_ No. 23 CV 15570, 2024 U.S. Dist. LEXIS 5131, at *8–9 (N.D. Ill. Jan. 10, 2024) (distinguishing _Ohio_ because of the procompetitive benefits of the challenged eligibility rules); _Brantmeier_, 2024 U.S. Dist. LEXIS 182251, at *3.

The NCAA requests that this Court exercise caution in adjudicating Plaintiff's request to play in the Spring 2025 season, which threatens to disrupt the experience of other student-athletes. Plaintiff provides evidence merely pertaining to his own unique circumstances, including limited declarations from himself, his current baseball coach, and a KSU Collective employee.  But he fails to contemplate or address the broader issues created by changing eligibility rules wholesale, including on the precipice of the season.  As a judge in district court within the Tenth Circuit warned: "'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction.'" _Ramsay v. Frontier, Inc._, No. 19-CV-03544-CMA-NRN, 2020 WL 4557545, at *16 (D. Colo. July 30, 2020), _report and recommendation adopted_, No. 19-CV-03544-CMA-NRN, 2021 WL 651021 (D. Colo. Feb. 19, 2021) (citation and internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the NCAA requests that the Court deny Plaintiff's request for TRO

and set a briefing schedule and hearing date on Plaintiff's request for preliminary injunctive relief.

Respectfully submitted,

*s/ Victoria L. Smith*
Victoria L. Smith (KS 16502)
Douglas R. Dalgleish (KS 22328)
Stinson LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
T: (816) 842-8600
F: (816) 691-3495
Vicki.smith@stinson.com
Doug.dalgleish@stinson.com
*Counsel for Defendant NCAA*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2025, I electronically filed the foregoing Response to Plaintiff's Motion For Temporary Restraining Order with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties and counsel of record.

Dated: February 19, 2025

By: */s/ Victoria L. Smith*
Victoria L. Smith
Stinson LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Vicki.smith@stinson.com
*Counsel for Defendant NCAA*