IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CARY ARBOLIDA,

Plaintiff,

v.                                                    Case No.  25-2079-JWB

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Plaintiff's motion for a temporary restraining order and preliminary injunction, along with a memorandum in support.  (Doc. 4, 7.)  Plaintiff, who is seeking to join the Kansas State University ("K-State") baseball team, has expended all his years of eligibility under the intercollegiate competition rules promulgated by Defendant, the National Collegiate Athletic Association ("NCAA").  Plaintiff moved for an order restraining Defendant from enforcing its eligibility rules, which would thereby allow him to participate in the Spring 2025 baseball season for K-State.  The court held a hearing regarding Plaintiff's motion on February 20, 2025.[1]  Plaintiff's motion is DENIED IN PART and TAKEN UNDER ADVISEMENT IN PART for the reasons stated herein.

I.      **Facts and Procedural History**

The following facts are taken from Plaintiff's submissions for his motion, Defendant's response to the motion, and arguments from the motion hearing.  Plaintiff is a baseball player who began his collegiate education at Orange Coast College, a two-year junior college ("JUCO"), in

---

[1] Defendant appeared by counsel for the limited purpose of responding to the motion for a temporary restraining order, since Plaintiff has not yet effected service on Defendant.

the fall of 2019.  Although his first season of competition was cut short due to COVID-19, Orange

Coast still played against twelve other JUCOs.  (Doc. 4-1 at 2.)  Plaintiff then transferred to the

University of California-Santa Barbara in the fall of 2020, but after failing to retain his spot on the

baseball team, he transferred back to Orange Coast for his second baseball season in spring 2021.

(*Id*. at 1.)  He then played for Orange Coast in both the spring 2021 and spring 2022 seasons and

graduated with a two-year degree in liberal arts.  (*Id*. at 2.)

After graduating from Orange Coast, Plaintiff enrolled at the University of Houston, where

he played two years of Division I baseball, winning various honors and leading the team in several

statistical categories.  (*Id*.)  After graduating from the University of Houston in May 2024, Plaintiff

was not selected in the 2024 Major League Baseball draft.  (*Id*.)  In June 2024, the University of

Houston submitted a season of competition waiver request to the NCAA on Plaintiff's behalf,

asking that, contrary to the NCAA's eligibility rules, the seasons Plaintiff played at the JUCO level

not be counted against his total years of eligibility for Division I baseball.  (Doc. 11-1 at 2.)  This

request was denied in October of 2024.  (*Id*.)  After his petition was denied, Plaintiff enrolled at

the University of Tampa (an NCAA Division II member institution) in the Fall of 2024.  (Doc. 4-

1 at 2.)

On December 18, 2024, the United States District Court for the Middle District of

Tennessee issued an injunction against the NCAA in the case of *Pavia v. National Collegiate

Athletic Association*, No. 3:24-CV-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024).  The

court in that case determined that a college football player at Vanderbilt University, who had

initially competed for a JUCO prior to joining a NCAA Division I member institution, was entitled

to injunctive relief precluding application of NCAA Bylaws 12.02.6 ("intercollegiate competition

rule") and 12.8 ("five-year rule") on the grounds that they were anticompetitive and violated

Section one of the Sherman Antitrust Act, 15 U.S.C. § 1. (*Id*.) In response to that order, the NCAA issued a blanket waiver to former JUCO athletes who used their final year of Division I eligibility during the 2024-25 academic year, permitting them an additional year of Division I eligibility in the 2025-26 academic year. (Doc. 7 at 7.)

Considering this potential change to NCAA rules, Plaintiff entered the NCAA transfer portal on January 3, 2025. (Doc. 4-1 at 2.) He was promptly recruited by K-State, and Plaintiff committed to join the K-State baseball program later in January 2025. (*Id*.) Plaintiff claims that he can earn at least $50,000 in name, image, and likeness ("NIL") compensation as a member of the K-State baseball team this season, (*Id*. at 3), an assertion that is reinforced by a declaration from Ryan Henington, a vice president with Wildcat Creative, LLC. (Doc. 4-3.) Upon joining the K-State baseball team, K-State submitted a second waiver request to the NCAA on behalf of Plaintiff. (Docs. 4-2 at 2; Doc. 1-3.) At present the NCAA has not ruled on this second waiver request. (Doc. 4-2 at 2.)

On February 14, 2025, the same day as the first K-State baseball game of the spring 2025 season, Plaintiff filed the present action against the NCAA. (Doc. 1.) He alleges that the NCAA's intercollegiate competition rule and five-year rule violate Section 1 of the Sherman Antitrust Act, and that the NCAA engaged in tortious interference with a business relationship and breach of contract. (*Id*.) He now seeks a temporary restraining order and a preliminary injunction to stop the NCAA from enforcing its rules. (Doc. 4.)

## II.    Standard of Review

When addressing a motion for both a temporary restraining order and a preliminary injunction, the court applies the same preliminary injunction standard. Four factors must be satisfied by the movant to obtain injunctive relief: (1) the movant is substantially likely to succeed

on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction is in the public interest. *First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1084 (D. Kan. 2020). Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal. *Id*., *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In seeking such an injunction, the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (citation and internal quotation marks omitted). However, where a movant fails to establish a likelihood of success on the merits, it is unnecessary to address the remaining requirements for a preliminary injunction. *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015).

## III.    Analysis

With the benefit of a hearing and briefing on the issues so far, the court is not convinced that Plaintiff has demonstrated a likelihood of success on the merits of his antitrust claim, nor has he shown an irreparable harm that would require a temporary restraining order.

In his challenge to both the NCAA's intercollegiate competition and five-year rules, Plaintiff does not allege a *per se* violation of the Sherman Act, but rather alleges that the NCAA bylaws violate the rule of reason test by imposing an undue restraint in the labor market for student athletes. (Doc. 7 at 10-11.) This rule of reason test "generally requires a court to conduct a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)) (internal quotations omitted). To determine whether a restraint violates the rule of reason, courts often employ a three-step, burden-shifting

framework. First, Plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect. If Plaintiff carries its burden, then the burden shifts to Defendant to show a procompetitive rationale for the restraint. If Defendant makes this showing, then the burden shifts back to Plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018).

After the Supreme Court's decision in *Alston*, it is generally accepted that the NCAA engages in some commercial activity, but challenging specific NCAA rules requires a factual determination of market activity for purposes of a potential violation of Section 1 of the Sherman Antitrust Act. *See* 15 U.S.C. § 1; *Alston*, 594 U.S. at 94-95. *See also Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-CV-238, 2024 WL 4433307 (M.D.N.C. Oct. 7, 2024) (dealing with challenges to the NCAA's prize money rules); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 761–62 (E.D. Tenn. 2024) (dealing with challenges to the NCAA's NIL rules). Although student athletes are arguably a commercial labor market, the rule of reason test requires more than just a commercial market; rather, it requires a factual analysis of a market to assess market power and market structure. Such a factual record is lacking here. Plaintiff argues that there are three harms from the NCAA's rules: 1) the rules harm JUCOs through giving NCAA Division I member institutions a competitive advantage, 2) the rules harm athletes by inducing them to attend NCAA Division I member institutions over JUCOs, "even if junior college is a better choice for the athlete academically, athletically, or otherwise at that time" (Doc. 7 at 12), and 3) the rules harm consumers of college athletics by reducing sporting competitiveness for the schools they love. However, Plaintiff has not provided facts beyond his individual circumstance which would allow the court to evaluate the market for purposes of an antitrust analysis and so the

court is unable to evaluate the veracity of these harms. *See, e.g.*, *Ciulla-Hall v. Nat'l Collegiate Athletic Ass'n*, No. 25-CV-10271-DJC, 2025 WL 438707, at *2 (D. Mass. Feb. 7, 2025).

Even if Plaintiff had included a broad market analysis in his motion for equitable relief, the court is not convinced that the NCAA's intercollegiate and five-year rules are anticompetitive. The undersigned notes that some other federal district courts have begun to issue injunctions based on a theoretical monopsony model of the college sports labor market. *See Pavia*, 2024 WL 5159888, at *5-*12 (M.D. Tenn. Dec. 18, 2024); *see also Fourqurean v. Nat'l Collegiate Athletic Ass'n*, No. 25-cv-68-wmc, Docket No. #39 (W.D. Wis. Feb. 6, 2025). However, the court is not convinced that a pure monopsony model applies to the college baseball labor market given the constraints on the relevant labor market (i.e. student athletes) that the NCAA rules create.[2] The NCAA, and college sports in general, is an "industry in which horizontal restraints on competition are essential if the product is to be available at all." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984).

By placing eligibility limits on students, the NCAA member institutions are increasing competition between themselves by imposing a limit on the potential labor supply. The practical effect of the NCAA's intercollegiate competition and five-year rules is to limit the total potential supply of student athletes each season, because the rules limit eligibility to four years of play over a five-year span of time. *See* NCAA Bylaws, § 12.8, et seq. By contrast, in the absence of the challenged NCAA rules, the supply of student athletes to the relevant labor market would likely increase substantially since athletes could continue to participate in the market indefinitely so long

---

[2] The court also questions the implied assumption in Plaintiff's briefs and the opinions by courts such as the Middle District of Tennessee in *Pavia*, 2024 WL 5159888 at *11, that JUCOs and NCAA Division I member institutions are perfect substitutes. Based on the *Pavia* decision, Plaintiff here contends that the NCAA intercollegiate competition rules drive students to Division I schools over JUCOs. Although the record in this case is not developed enough to provide a comprehensive comparison, there appears to be a reputational, resource, and monetary difference between JUCOs and Division I member institutions that makes them weak substitutes independent of the NCAA rules for eligibility.

as they met all the other eligibility requirements. *See, e.g.*, *Alston*, 594 U.S. at 74-78 (collecting historical examples of various pay-to-pay, "tramp athletes," and questionable enrollment practices for purposes of sporting events prior to the NCAA rules and guidelines). The current eligibility rules would thus seem to increase competition among NCAA member institutions (along with other institutions such as JUCOs) for the limited supply of potential labor, thereby driving up the potential compensation for labor market participants. For example, the recent high-profile recruiting efforts by the University of Michigan and Louisiana State University to recruit the top 2025 football prospect Bryce Underwood to their respective football programs highlights labor market consequences of the Supreme Court' decision in *Alston* and shows the effect of increased competition by NCAA member institutions in the college athlete market. *See* Andrew Hughes, *Michigan's $10.5 million NIL offer for in-state high school football star not expected to complete recruit's flip to Wolverines*, SPORTING NEWS (Nov. 14, 2024 at 1pm CST), https://www.sportingnews.com/us/ncaa-football/news/michigan-10-million-nil-offer-state-high-school-football-star-not-expected-complete-recruit-flip-wolverines/a28c3fb73de185dd12354360. NCAA member institutions with wealthy boosters and engaged alumni will naturally have more resources to compete for top prospective talent. This kind of behavior may lead to disparity in sporting talent between schools with resources and others without the same level of resources (such as JUCOs), but it seems to represent an increase in competition in relevant markets for purposes of antitrust analysis.

Based on the foregoing, it would seem to the court at this early stage of the litigation, and on the limited record available at this point, that the effect of the challenged rules is to increase competition, at least as between schools competing for talent in the student athlete labor market. At the hearing, Plaintiff suggested that the court was incorrectly evaluating the effects of the

NCAA rules on competition in the market, arguing instead that the court should focus on the harm to JUCOs who suffer from the enhanced competition over the limited supply of student athletes or that the court should look to the alleged harm suffered by student athletes who face increased pressure to attend NCAA Division I schools due to the challenged rules. Perhaps Plaintiff is correct, but this lack of clarity regarding the proper market analysis is even more reason to avoid setting aside long-established NCAA eligibility rules until the parties can compile a more thorough record and further brief the court on the appropriate focus of the rule-of-reason inquiry. Suffice it to say, the outcome of the rule of reason does not always dictate an equal outcome for every market participant. For example, the quest for competitiveness in the student athlete market by the Supreme Court in *Alston* upheld an injunction on NCAA limits regarding certain education-related benefits that schools could provide to student athletes. *Alston*, 594 U.S. at 103, 107. Enjoining the enforcement those limits meant that schools were free to provide more "enhanced education-related benefits" than they could under the challenged NCAA rules. *Id*. at 107. This ability for NCAA member institutions to provide enhanced services and benefits doubtlessly favors richer schools who have more resources out of which to pay the higher benefits. In most instances, these services and benefits likely favor larger, wealthier, NCAA Division I schools over smaller, less well funded JUCOs; yet this was an acknowledged potential result of the antitrust violations enjoined in *Alston*. *Id.* at 79. In any event, the court finds that Plaintiff has failed to establish a likelihood of success on the merits of his claim and Plaintiff's motion for a temporary restraining order must be denied.

Even though Plaintiff fails to meet his burden of showing a substantial anticompetitive effect by the NCAA rules and cannot succeed in showing a likelihood of success on the merits of his claim, the court will briefly address the irreparable harm aspect of the injunction test. Insofar

as Plaintiff alleges that he will suffer irreparable harm by not being able to play for the K-State baseball team this year, this injury is due in part to Plaintiff's own actions in waiting to file the present suit. This case was filed on the afternoon of Friday, February 14, 2025; hours after the first pitch of the first game of the K-State baseball season that same morning. (Doc. 7 at 15.) Plaintiff knew of his eligibility predicament for over a year; in fact, he submitted a season of competition waiver to the NCAA when he was still a potential member of the University of Houston baseball team in June 2024.[3] (Doc. 11 at 2.) Upon his recruitment to K-State, he once again submitted a waiver to the NCAA for the spring 2025 season. (Doc. 1-3.) However, given that this second waiver is still pending with the NCAA, Plaintiff waited until the day of his team's first game to file his antitrust case. There is no "law that requires a plaintiff to exhaust the administrative remedies of the NCAA . . . as a prerequisite to bring an antitrust suit." *Wade v. Nat'l Collegiate Athletic Ass'n*, No. 2:24-CV-196-TBM-RPM, 2024 WL 5212665, at *4 (S.D. Miss. Dec. 23, 2024). Therefore, Plaintiff's own delay in filing his suit, along with the potential for regaining multiple years of eligibility should he prevail on the merits of this case, weighs against Plaintiff regarding the irreparable harm prong. Several other district courts have reached the same conclusion when evaluating claims like those of Plaintiff and denying motions for a temporary restraining order against the NCAA. *See Id.* (holding that Plaintiff was "partially to blame for this being an emergency in the first place"); *Pavia*, No. 3:24-cv-1336, Docket No. 15 (M.D. Tenn. Nov. 12, 2024) (denying a temporary restraining order where "Plaintiff has almost certainly been aware of the challenged bylaws and his ineligibility . . . for quite some time and has been discussing possible resolution with the NCAA"); *Ciulla-Hall*, 2025 WL 438707, at *3 (denying an emergency injunction in a situation "in part attributable to [Plaintiff's] delay in seeking injunctive relief");

---

[3] This first waiver request by the University of Houston was denied in October 2024, and neither Plaintiff nor the University of Houston appealed this denial of the eligibility waiver request. (Doc. 11-1 at 2.)

*Sanchez v. Nat'l Collegiate Athletic Ass'n*, No. 25-cv-62, Docket No. 15 (E.D. Tenn. Feb. 13, 2025) (denying a temporary restraining order where "Plaintiff knew of his eligibility predicament"). Thus, even if Plaintiff met his burden of showing a substantial anticompetitive effect by the NCAA, the lack of irreparable harm weighs against granting a temporary restraining order.

Although the current record does not sustain the proposition that the Plaintiff is likely to succeed on the merits of his claim, other federal courts have found a likelihood of success for similarly situated college athletes in the Division I football markets when evaluating their cases for a preliminary injunction rather than a temporary restraining order. *See Pavia*, 2024 WL 5159888, at *5-*12 (M.D. Tenn. Dec. 18, 2024); *see also Fourqurean*, No. 25-cv-68-wmc, Docket No. #39 (W.D. Wis. Feb. 6, 2025). Thus, with the benefit of a more complete record, Plaintiff may be able to succeed in an adversarial preliminary injunction proceeding even if a motion for a temporary restraining order is denied. *See, e.g.*, *Wade*, 2024 WL 5212665, at *4 (denying a temporary restraining order against the NCAA regarding a college basketball player based on an alleged antitrust violation by NCAA rules); *but cf. Wade v. Nat'l Collegiate Athletic Ass'n*, No. 2:24-CV-196-TBM-RPM, Docket No. 20 (S.D. Miss. Jan. 17, 2025) (showing Plaintiff reached a confidential settlement with NCAA allowing him to play for the 2024-25 season).[4] Therefore, Plaintiff's motion for preliminary injunction is taken under advisement and the parties are directed to consult together and propose a briefing schedule and hearing date for the preliminary injunction hearing.

## IV.    Conclusion

Plaintiff's motion for a temporary restraining order (Doc. 4) is DENIED. Plaintiff's motion

---

[4] *See also* Sam Sklar, *Southern Miss basketball player John Wade III ruled eligible after lawsuit with NCAA*, HATTIESBURG AM. (Jan. 17, 2025 at 12:42 p.m.), https://www.hattiesburgamerican.com/story/sports/college/southern-miss/2025/01/17/john-wade-lawsuit-southern-miss-basketball-ncaa/77777934007/

for a preliminary injunction (Doc. 4) is TAKEN UNDER ADVISEMENT. Parties are directed to propose a briefing schedule and preliminary injunction hearing date no later than February 28, 2025.

IT IS SO ORDERED. Dated this 21st day of February, 2025.

        s/ John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE