**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CARY ARBOLIDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:25-cv-02079-JWB-BGS |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC | ) | |
| ASSOCIATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION**
**FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

Plaintiff Cary Arbolida ("Arbolida") has the present opportunity to play for Kansas State University's ("KSU") 2025 baseball team. This opportunity will not exist for Arbolida if he is not allowed to play during the spring 2025 spring for one simple reason: the current KSU baseball team will not be together past the end of this season. As a result, Arbolida suffers irreparable harm every day that he is denied the unique opportunity to play for *this* KSU baseball team.

Other factors add to the irreparable harm Arbolida is presently suffering. Along with playing for KSU's current team comes the present opportunity to play for the winningest active Big 12 head baseball coach and to increase Arbolida's potential draft prospects for the 2025 MLB draft. Neither of these things are guaranteed to be available to Arbolida after this season, and neither of them can be quantified or remedied with money damages. In addition, because he is unable to play for KSU's baseball team Arbolida is missing out on currently available compensation for the use of his name, image and likeness ("NIL").

Without intervention from this Court, Defendant National Collegiate Athletic Association ("NCAA") will unlawfully prevent Arbolida from taking advantage of the unique opportunity that is

1

**EXHIBIT A**

only available to him now, simply because he previously played baseball at a junior college ("JUCO"). The Bylaws which the NCAA seeks to enforce against Arbolida are anticompetitive in nature and illegally restrain the labor market for NCAA Division I athletics in violation of Section I of the Sherman Act by precluding former JUCO athletes like Arbolida from taking advantage of the many benefits and opportunities gained through playing four years of Division I athletics.

The U.S. District Court for the Middle District of Tennessee recently addressed this very issue in *Pavia v. National Collegiate Athletic Association*. The court found that Pavia, a Division I football player, was likely to succeed on the merits of his claim that the NCAA's enforcement of Bylaw 12.02.6 (the same Bylaw at issue in this case) would violate the Sherman Act and that Pavia would suffer immediate and irreparable harm absent injunctive relief. *Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-cv-01336, 2024 WL 515988, at *12–13 (M.D. Tenn. Dec. 18, 2024) Accordingly, the court issued a preliminary injunction enjoining the NCAA from enforcing Bylaw 12.02.6 against Pavia, which would have prohibited Pavia from playing a *fourth* year of Division I football on account of his prior JUCO year. *Id.* at *13. Shortly thereafter, the NCAA issued a blanket waiver permitting athletes who attended and competed at non-NCAA schools, such as junior colleges, for one or more years to remain eligible and compete in a fourth season of Division I athletics for the 2025-2026 school year if the athletes otherwise would have used their final year of eligibility during the 2024–2025 school year ("Blanket Waiver"). (Doc. 1-2).

*Pavia* fits this case like a glove, and like the *Pavia* court, this Court should issue a preliminary injunction. Permitting the NCAA to enforce Bylaw 12.02.6 against Arbolida to prohibit him from playing for this year's KSU baseball team, an opportunity that is only available to Arbolida now, because of his prior JUCO participation would wrongfully restrain him from participating in the relevant market and, as set forth herein and in Arbolida's Motion and supporting declarations, would cause him to suffer immediate and irreparable harm. As such, Arbolida respectfully requests that this

Court grant his Motion for a Preliminary Injunction, in accordance with the rationale laid out in *Pavia.*

## II.     FACTUAL BACKGROUND

### A.     The NCAA and Its Bylaws

The NCAA is a powerful, unincorporated association that regulates and controls all aspects of collegiate athletics. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 79 (2021). It is made up of member institutions that are divided into Division I, Division II, and Division III institutions. *Id.* Division I institutions represent the highest level of collegiate competition.  Division I institutions compete against each other in recruiting top talent by offering various benefits, such as scholarships, access to top tier training facilities and coaching staff, medical treatment, opportunities to compete at the highest collegiate level, exposure to scouts and other recruiters, nationwide publicity, and, starting this year, by directly contracting with and paying athletes millions of dollars per year for their participation on varsity athletics teams..  This process is highly competitive.  For example, less than 2.5% of high school baseball players will go on to compete in Division I athletics.[1]  The NCAA recognizes that JUCO transfers are an important part of the Division I sports labor market, noting that "every year hundreds of talented JUCO players transfer to NCAA Division I four-year colleges around the country looking to make an impact."[2]  However, as set forth below, the NCAA seeks to enforce anticompetitive rules that disproportionately affect Division I athletes who have competed at JUCOs.

---

[1] *Estimated Probability of Competing in College Athletics*,  NCAA (Apr. 1, 2024), https://www.ncaa.org/sports/2015/3/2/estimated-probability-of-competing-in-college- athletics.aspx.
[2] *College Baseball's Top 50 Impact JUCO Transfer Hitters*, NCAA (Dec. 4, 2024), https://www.ncaa.com/news/baseball/article/2024-12-04/college-baseballs-top-50-impact-juco- transfer-hitters.

The NCAA's stated purpose is to act in the best interest of the student-athletes and to coordinate and deliver safe, fair, and inclusive competition.[3] The NCAA regulates and controls Division I athletics through Bylaws published in its Division I Manual ("Bylaws"). (Doc. 1-1). The Bylaws are adopted and entered into by member institutions and interpreted and enforced by the NCAA. Because junior colleges are not NCAA members, the Bylaws do not apply to them. The Supreme Court has rightfully noted that, "[a]t the center of this thicket of associations and rules sits a massive business." *Alston*, 594 U.S. at 79. The NCAA profits substantially off the services that its athletes provide, generating nearly $1.3 billion in revenue for the 2022–2023 year through various media rights and marketing deals tied to its athletic events.[4] Division I institutions profit off athletes as well, with the NCAA reporting that Division I institutions earned $11.2 billion in revenue generated from athletic departments in 2022.[5]

An academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain NCAA membership and abide by the NCAA Bylaws. Similarly, athletes who wish to play at the highest level must enroll in an NCAA Division I institution and acquiesce to the NCAA's Bylaws. The relevant Bylaws in this case are as follows:

> **12.8    Seasons of Competition: Five-Year Rule**. A student-athlete ***shall not engage in more than four seasons of intercollegiate competition in any one sport*** (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:[6]

---

[3] *Mission and Priorities,* NCAA, https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx#:~:text=Provide%20world%2Dclass%20services%20to,improves%20health%2C%20safety%20and%20performance (last visited Feb. 25, 2025).

[4] *NCAA Generates Nearly $1.3 Billion in Revenue for 2022–2023*, ASSOCIATED PRESS (Feb. 1, 2024), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23.

[5] *Division I Athletics Finances 10 Year Trends from 2013 to 2022*, NCAA (Dec. 2023), https://ncaaorg.s3.amazonaws.com/research/Finances/2023RES_DI-RevExpReport_FINAL.pdf

[6] For purposes of completeness, the entirety of Bylaw 12.8 is cited; however, Arbolida does not contend that

4

**12.8.1 Five-Year Rule.** A student-athlete shall complete the student- athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.

**12.8.1.1 Determining the Start of the Five-Year Period**. For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4). when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum fulltime program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2).

**12.02.6 Intercollegiate Competition.** Intercollegiate *competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution* does any of the following:

> (a)  Represents the institution in any contest against outside competition, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;

> (b)  Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or

> (c)  Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

**14.02.4 Collegiate Institution**. A collegiate institution (for purposes of NCAA legislation) is an institution of higher education that:

> (a)  Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree;

> (b)  Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at

---

Bylaw 12.8.1 and 12.8.1.1 prohibit him, specifically, from competing in a third year of Division 1 baseball. These Bylaws establish an eligibility clock in which athletes must complete their years of eligibility.  Per the NCAA's Covid extension waiver, Arbolida has six years to complete his eligible years.  Because Arbolida first enrolled in a collegiate institution in Fall 2019, his eligibility clock does not expire until Fall 2025.

least a one-year program of study creditable toward a degree; or

(c)   Is located in a foreign country.

(emphasis added).

When viewed together, these Bylaws limit a college athlete's eligibility to four competitive seasons within five calendar years, which due to Covid-19 was extended to six calendar years for most athletes who competed in 2020, including Arbolida.[7] Relevant to this case, (i) an athlete's participation in a sport at a JUCO constitutes "intercollegiate competition" and counts as a year of Division I eligibility and (ii) an athlete's attendance at a JUCO starts his eligibility clock (collectively, the "JUCO Penalty").

**B.    Supreme Court Enjoins NCAA from Enforcing Bylaws that Ban Athletes from Earning Compensation from Use of Their Name, Image, and Likeness**

In 2021, the Supreme Court issued a landmark ruling recognizing that the NCAA is subject to the Sherman Act for its restraints on trade and finding that certain Bylaws that limited the benefits college athletes could receive in exchange for their athletic services in the relevant market violated the Sherman Act. *Alston,* 594 U.S. at 108 (Kavanaugh, J., concurring) ("the NCAA has long shielded its compensation rules from ordinary antitrust scrutiny . . . the Court's decision marks an important and overdue course correction.").[8] After the *Alston* decision, the NCAA abandoned its rules prohibiting college athletes from earning compensation on the use of their NIL.  Since then, college athletes have been permitted to earn NIL compensation, adding an inherently economic component to participation in college sports. And beginning this year, and as a result of another antitrust lawsuit filed against the NCAA known as the *House v NCAA* case, Division I member schools will be able

---

[7]    *2021    NCAA    Division    I    COVID-19    Question    and    Answer    Guide*,    NCAA https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19QAGuide.pdf (last modified (July  30, 2021).

[8] The relevant market in *Alston* was defined as "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *Alston*, 594 U.S. at 81.

to directly pay their athletes, ostensibly for the use of the athletes' NILs, but inherently tied to their participation on a varsity athletics team.[9] The model being implemented to allow schools to directly pay their athletes functions just like models in professional sports, with the inclusion of things like an annual salary cap based on the amount of revenue generated by the largest Division I member institutions. Just like employment contracts for their coaches, the contracts that athletes are already entering into with schools (or will be entering into) to memorialize these new payments contain buyouts, incentive payments, and clauses that terminate the contracts if an athlete is no longer a member of a school athletics team.[10] This direct NIL compensation from institutions, and other meaningful NIL compensation from third parties, is only available to athletes competing at the Division I level.

Through its regulatory power and market control, the NCAA can arbitrarily and capriciously deny a college athlete the ability to enjoy the economic, developmental and other benefits of the Division I athletics market based solely on the athlete's prior participation in JUCO sports, even though participation in JUCO sports does not offer the same unique benefits and opportunities as NCAA Division I sports. College athletes have little recourse, though, because if an athlete desires to participate in the highest level of collegiate athletics, he or she has no real option but to enroll at an NCAA Division I institution and acquiesce to the NCAA's Bylaws.

C.    **On December 18, 2024, the District Court for the Middle District of Tennessee Enjoined the NCAA from Enforcing Bylaw 12.02.6, Which Would Have Prevented Deigo Pavia's Participation in Division I Athletics Based on His JUCO Sports Participation**

In November 2024, Vanderbilt University quarterback Diego Pavia sued the NCAA, seeking

---

[9] *Brief on House v. NCAA Settlement, Knight Commission on Intercollegiate Athletics* (Feb. 12, 2025), https://www.knightcommission.org/wp-content/uploads/KnightCommissionBrief_HousevNCAA_182025.pdf
[10] *We Reviewed College Athlete Contracts—Here's How Performance Adjustments, Buyouts, and Bowl Incentives Work* (Jan. 31, 2025), https://www.cbssports.com/college-football/news/we-reviewed-college-athlete-contracts-heres-how-performance-adjustments-buyouts-and-bowl-incentives-work/

injunctive relief from the same Bylaws at issue here. *Pavia*, 2024 WL 515988, at *1-4. Pavia began his collegiate football career at a JUCO in the Fall of 2020, where he played two seasons of JUCO football. *Id*. at 4. His 2020 JUCO year was disregarded due to Covid, while his 2021 JUCO year counted towards his NCAA eligibility because of the JUCO penalty. *Id*. Pavia then transferred to Division I institution New Mexico State for the 2022 and 2023 seasons and Division I institution Vanderbilt University for the 2024 season—his *third* year of Division I college football. *Id*.

Pavia sought injunctive relief on the grounds that the NCAA's Bylaw 12.02.6, which imposes the JUCO Penalty by limiting his Division I eligibility to three seasons, is anticompetitive in nature and violates the Sherman Act. *Id*. at *1. On December 18, 2024, the U.S. District Court for the Middle District of Tennessee found that Pavia was likely to succeed on his antitrust claim and consequently granted him a preliminary injunction, enjoining the NCAA from enforcing Bylaw 12.02.6 against him. *Id*. at *12–13. As a result of the injunction, Pavia is eligible to play a fourth year of Division I football at Vanderbilt in the Fall of 2025. *Id.* at *13.

In the wake of the *Pavia* decision, the NCAA issued a Blanket Waiver to former JUCO athletes who used their final year of Division I eligibility during the 2024-2025 academic year, permitting them an additional year of Division I eligibility in the 2025-2026 academic year. (Doc. 1-2). This Blanket Waiver, while a step in the right direction, arbitrarily excludes former JUCO athletes like Arbolida who, despite using only *two* years of Division I eligibility, used his fourth year of NCAA eligibility during the 2023–2024 academic year.

### D.    The Facts in the Instant Case are Virtually the Same as the Facts in *Pavia*

Arbolida's path to Division I baseball is nearly identical to Pavia's path to Division I football. Like Pavia, Arbolida started out at a JUCO; Arbolida attended Orange Coast College ("OCC"), where he played three years of JUCO baseball. (Doc. 4-1 at ¶ 1). His Spring 2020 season was disregarded due to Covid, but his Spring 2021 and Spring 2022 seasons each counted as a year of NCAA eligibility

because of the JUCO penalty. (*Id.* at ¶¶ 1, 3). After graduating from OCC, he enrolled at the University of Houston ("UH"), where he played two years of Division I baseball. (*Id.* at ¶ 4). He now seeks to play his third year of Division I baseball at Kansas State University ("KSU").

Like Pavia, Arbolida enjoyed great success during his years of Division I competition. While at UH, Arbolida was a 2024 All-Big 12 Second Team selection (*Id.* at ¶ 4). In 2024, he set the UH single season slugging percentage record and led the team in home runs and batting average. (*Id.*). Like Pavia, Arbolida's athletic success has created valuable NIL opportunities. (*Id.* at ¶ 9; Doc. 4-3 at ¶4). If Arbolida is able to play a third year of Division I baseball in the Spring 2025 season, he has the potential to earn at least $50,000 in NIL compensation. (Doc. 4-1 at ¶ 9; Doc. 4-3 at ¶ 4).

The only difference between Pavia's case and Arbolida's case is that Pavia used his fourth year of NCAA eligibility—and *third* year of Division I eligibility—in the 2024-2025 academic year, while Arbolida used his fourth year of NCAA eligibility—and his *second* year of Division I eligibility—in the 2023-2024 academic year. This is a distinction without a difference for purposes of granting Arbolida's waiver request and request for injunctive relief. The NCAA has already awarded a *fourth* year of Division I eligibility to athletes like Pavia and there is no basis to deny Arbolida a *third* year of Division I eligibility.

### III.    LEGAL STANDARD

To obtain a preliminary injunction under Fed. R. Civ. P. 65, Arbolida must clearly show "(1) [he] is substantially likely to succeed on the merits; (2) [he] will suffer irreparable injury if the injunction is denied; (3) [his] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (citing *Beltronics USA, Inc. v. Midwest Inventory Distrib.*, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)). To seek an injunction that alters the status quo, as is the case

here, Arbolida must "'make a strong showing' both on the likelihood of success on the merits and on the balance of the harms." *State v. Environmental Protection Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021). To make this showing, Arbolida must demonstrate that his motion is supported by "the exigencies of the case." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Moreover, in showing a likelihood of success on the merits, a plaintiff is not required to demonstrate a likelihood of success on all claims." *See also, Winter v. Nat'l Resources Def. Council, Inc*., 555 U.S. 7, 19n.4 (2008) (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint). Thus, while Arbolida contends that he is entitled to injunctive relief on the basis of all claims set forth in his Verified Complaint, this Memorandum focuses on his antitrust claim. For the reasons set forth herein, Arbolida has met the standard for injunctive relief.

## IV.    ARGUMENT

Weighing the four factors outlined above, the Court should grant Arbolida a preliminary injunction and enjoin the NCAA from enforcing Bylaw 12.02.6 against Arbolida on the grounds that it violates the Sherman Act and has caused and will continue to cause immediate and irreparable harm to Arbolida.

### A.    Arbolida is Likely to Succeed on the Merits of His Sherman Act Claim

To succeed under Section 1 of the Sherman Act, a plaintiff must show that the defendant (1) participated in an agreement that (2) unreasonably restrains trade in the relevant market. *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1280 (10th Cir. 2012); *see also Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). The NCAA cannot— and in its Response in Opposition to Plaintiff's Motion for Temporary Restraining Order, does not— deny that it participates in an agreement with its member institutions to adopt and enforce the

eligibility Bylaws at issue in this case. (Doc. 11 at 12–14); *see, e.g., Pavia*, 2024 WL 515988, at *6 ("The parties do not dispute that NCAA member institutions "participate in an agreement" regarding the challenged rules."); *Alston*, 594 U.S. at 80 ("The NCAA did not 'contest evidence showing' that it and its members have agreed to compensation limits on student-athletes . . . ."); *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-00068-wmc (ECF No. 39 at 7) (W.D. Wisc. Feb. 6, 2025) ("Since *Alston*, no one can reasonably dispute that the NCAA and its members (like other associations of competitors) amount to a 'combination, contract, or conspiracy.'"). Therefore, Arbolida focuses his analysis on whether the challenged Bylaws unreasonably restrain trade in the relevant market.

1. **Threshold Issues: The Relevant Market and The Commercial Nature of the Bylaws**

Before demonstrating that the challenged Bylaws unreasonably restrain trade in the market, Arbolida must establish the relevant market and show that the challenged Bylaws are commercial in nature.

a. *The Relevant Market is the Market in the United States for the Labor of NCAA Division I Athletes*

Because the challenged Bylaws constitute horizontal agreements, the market need not be precisely defined. *See Pavia*, 2024 WL 515988, at *8, n.8 ("The eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements . . . the definition of the market need not be precise when the challenged restrictions are a horizontal restraint on trade.") (*citing Ohio v. American Express Co.*, 585 U.S. 529, 543 n.7 (2018)).

The relevant market in this case is NCAA Division I Athletics in the United States. In *Alston*, the Supreme Court explained the relevant market for men's Division I FBS football and men's and women's Division I basketball is:

> defined as the market for "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her

> sport-specific market." The "most talented athletes are concentrated" in the "markets for Division I basketball and FBS football." There are no "viable substitutes," as the "NCAA's Division I essentially *is* the relevant market for elite college football and basketball." In short, the NCAA and its member schools have the "power to restrain student-athlete compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance."

*Alston*, 594 U.S. at 81–82 (citations omitted).

Other courts hearing antitrust challenges to NCAA Bylaws have *repeatedly* followed *Alston* in finding NCAA Division I athletics to be the relevant market—*regardless of the particular sport played by the athletes challenging the Bylaws*. *E.g.*, *Pavia*, 2024 WL 515988, at *8 (finding relevant market in antitrust challenge brought by football player to be "the labor market for college football athletes in general and NCAA Division I football specifically); *Fourqurean*, ECF No. 39 at 8 (finding relevant market in antitrust challenge brought by football player to be NCAA's Division I); *House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 817 (N.D. Cal. 2021) (finding plaintiffs who competed on swimming and diving, women's basketball, and football teams had "adequately pleaded a relevant market" by defining that market as "the nationwide market for the labor of NCAA Division I college athletes"); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 761 (E.D. Tenn. 2024) (finding relevant market in antitrust challenge brought by the State of Tennessee and the Commonwealth of Virginia, on behalf of *all* student-athletes in their respective states, to be "Division I athletics"); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 592 (N.D. W.Va. 2023) (finding relevant markets in antitrust challenge brought by States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia on behalf of *all* student-athletes in their respective states to be the "labor markets within NCAA Division I college athletics in the United States").

Previewing its likely argument in opposition to the present request for a preliminary injunction, in its Response in Opposition to Plaintiff's Motion for Temporary Restraining Order, the

NCAA erroneously argued the relevant market for Division I baseball players is something other than NCAA Division I athletics. (Doc. 11 at 12–13). To support this argument, the NCAA characterizes the opportunities available to college baseball players as materially different from those available to college football players like Pavia because college baseball players have access to non-NCAA opportunities like JUCO and Major League Baseball's minor league system. (Doc. 11 at 12–13). Of course, the availability of JUCO teams does not distinguish the market for Division I baseball players from the markets for all other Division I athletes; football, basketball, and other Division I athletes can and do play JUCO sports—including Pavia himself. Nor does the existence of a minor league system distinguish the opportunities available to Division I baseball players from those available to college athletes whose labor markets have been defined by courts—including the Supreme Court—as NCAA Division I athletics. After all, the *Alston* Court defined the relevant market for men's college basketball players as men's Division I basketball despite the National Basketball Association's ("NBA") longstanding minor league—formerly known as the NBA D-League and now called the NBA G League—which the NBA started during the 2001–02 season and makes available to players who are eighteen or older.[11] *Alston*, 594 U.S. at 81. In light of the foregoing, the NCAA is in the unenviable position of arguing the relevant market for Division I baseball players should be defined differently than the relevant markets for *all other Division I athletes*. This proposition is wholly unsupported by the mounting number of cases disposing of antitrust challenges to the NCAA's various eligibility Bylaws. *Fourqurean*, ECF No. 39 at 8-9 ("Regardless, 'the NCAA and its member schools have the power to restrain' student-athlete eligibility 'in any way and at any time they wish, without any meaningful risk of diminishing their market dominance' for college sports. Therefore, the NCAA and its members enjoy monopsony

---

[11] *Frequently Asked Question: NBA G League*, NBA G LEAGUE, https://gleague.nba.com/faq (last visited Feb. 25, 2025).

power over student-athletes who effectively have no other market to sell their labor, turning professional . . . .").

Moreover, by its own actions the NCAA concedes that the relevant market for all Division I athletes, including baseball players, is NCAA Division I athletics. Following the *Alston* decision, the NCAA extended the *Alston* injunction—which the Supreme Court had limited to Division I football and basketball—to all Division I sports. *Alston*, 594 U.S. at 85. Similarly, following the *Pavia* decision, the NCAA extended the *Pavia* injunction—which the district court had limited to Pavia himself—to all Division I sports through its Blanket Waiver. *Pavia*, 2024 WL 515988, at *13. For all these reasons, the relevant market in the instant case is market in the United States for the labor of NCAA Division I athletes.

### b. Post-NIL Era, Courts have Repeatedly Found that NCAA Eligibility Bylaws, Including the Challenged Bylaws, are Commercial in Nature

The Sherman Act only applies if the challenged rule is commercial in nature. *Cohlmia*, 693 F.3d at 1280; *see also Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n,* 388 F.3d 955, 958 (6th Cir. 2004).

Following the Supreme Court's *Alston* decision, courts have treated the NCAA's eligibility Bylaws, which they once considered to be non-commercial, as commercial in nature. The *Alston* decision opened the door for college athletes to earn money off the use of their NIL. Since that change in the landscape of college sports, courts have repeatedly found that NCAA eligibility rules, which inherently affect an athlete's ability to negotiate and earn NIL compensation, are commercial in nature. *See, e.g., Ohio,* 706 F. Supp. 3d at 591 (finding Bylaw that required transfer students to sit out one year before being eligible to compete was commercial in nature); *Tennessee,* 718 F. Supp. 3d at 762 ("Agreements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are

14

also explicitly commercial in nature.").

Notably, the District Court for the Middle District of Tennessee analyzed Bylaw 12.02.6—the Bylaw at issue in the instant case—and found that the Bylaw is inherently commercial in nature. The court explained:

> Plaintiff asserts that when the NCAA lifted the restriction on NIL compensation, rules regulating who can play - *i.e.*, who can enter the labor market for NCAA Division I football - became "commercial in nature." The Court agrees. As the *Tennessee* court explained, "[a]greements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature." And it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature.

*Pavia*, 2024 WL 515988, at *6 (citations omitted). Clearly then, the challenged Bylaws are commercial in nature. This is even more true now, when Division I institutions are entering into direct agreements with athletes to pay them hundreds of thousands or even millions of dollars per year based on their participation on an institution athletics team. Rules that restrict who is eligible to play a Division I sport, and therefore eligible to be paid NIL compensation directly by a Division I institution, are clearly commercial in nature.

### 2. Applying the Rule of Reason Analysis, the Challenged Bylaws Unreasonably Restrain Trade in the Market

Having established the foregoing threshold issues, Arbolida must next show that the challenged Bylaws unreasonably restrain trade in the market. *Tennessee*, 718 F. Supp. 3d at 761. The reasonableness of the NCAA's restraints is reviewed under the Rule of Reason analysis. *Alston*, 594 U.S. at 88.

The rule of reason standard requires that the Court conduct a "'fact-specific assessment of market power and market structure' to assess a challenged restraint's 'actual effect on competition.'"" *Id*. While not a rigid test, the rule of reason analysis can be described as a three-step burden-shifting analysis:

The plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." Should the plaintiff carry that burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint." If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

*Id*. at 97 (internal citations omitted).

When conducting a rule of reason analysis, a court may approve or condemn a restraint in the "twinkling of an eye" with a "quick look." *Pavia*, 2024 WL 515988, at *8 (citing *Alston*, 594 U.S. at 97). As set forth below, when the rule of reason analysis is applied, Arbolida can show that he is likely to succeed on the merits of his Sherman Act claim.

### a. The Challenged Bylaws Have a Substantial Anticompetitive Effect

Plaintiffs can demonstrate a substantial anticompetitive effect directly or indirectly. *American Express*, 585 U.S. at 542. Indirect evidence of anticompetitive effects is "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted). Arbolida has provided sufficient indirect evidence to carry his burden of showing that the challenged Bylaws have a substantial anticompetitive effect.

First, the NCAA controls the market for college baseball players. As the Supreme Court explained:

The NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition . . . Unlike customers who would look elsewhere when a small van company raises its prices above market levels, the district court found (and the NCAA does not here contest) that student-athletes have nowhere else to sell their labor.

*Id.* at 90. Where, as is the case here, the NCAA has monopsony power over the labor market for college baseball, it also has "market power." *Pavia*, 2024 WL 515988, at *8 ("There is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have "market power.") (citations omitted); *Fourqurean*, ECF

16

No. 39 at 9 (holding that "[a]s the Supreme Court explained, defendant undoubtedly has market power"). Thus, the NCAA indisputably has market power in the instant case.

Second, although Alston arguably holds "that any restraints by defendant on student-athlete eligibility harms competition," *Fourqurean*, ECF No. 39 at 9, the challenged Bylaws harm competition in numerous concrete ways.  For example, Bylaw 12.02.6 harms competition between JUCOs and Division I schools for attracting talent. Because Bylaw 12.02.6 limits the NCAA Division I eligibility of athletes who attend JUCOs to two or three seasons, it encourages athletes to forego altogether or limit their time at JUCOs so as to maximize their time playing Division I sports—where they receive "more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes." Pavia at *8–9.

The Bylaws also distort the labor market for Division I athletics by pushing athletes to "attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically." *Id.* at *9. By inducing athletes to attend NCAA institutions rather than non-NCAA institutions like JUCOs, Bylaw 12.02.6 harms competition between JUCOs and Division I schools to attract talent. In addition, it is "apparent" the Bylaws have "an anticompetitive effect on the market for student-athletes by limiting who is eligible to play college [baseball]." *Fourqurean*, ECF No. 39 at 10.

Furthermore, courts have repeatedly held eligibility rules that prevent athletes from competing, like Bylaw 12.02.6, hurt college athletics consumers. For example, the *Pavia* court found that Bylaw 12.02.6 "harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level." *Id.* The District Court for the Northern District of West Virginia came to a similar conclusion when considering Bylaw 14.5.5.1, commonly known as the "Transfer Eligibility Rule," which rendered transfer athletes ineligible for intercollegiate competition for an entire academic year after transferring to a new NCAA institution. *Ohio*, 706 S. Supp. 3d at

17

594. In the *Ohio* court's opinion, Bylaw 14.5.5.1 diminished the value of the NCAA's product by (i) making teams less competitive than they would otherwise be with the benefit of their skilled transfer players, (ii) acting as a "barrier to increased parity" between large and small sports programs, and (iii) denying consumers the "opportunity to see their college institutions compete to win on gameday." *Id.* The District Court for the Western District of Wisconsin similarly found Bylaw 12.8, known as the Five-Year Rule, depressed competition for roster spots by "limiting who is eligible to play" college sports. *Fourqurean*, ECF No. 39 at 10.

Finally, eligibility rules like Bylaw 12.02.6 harm competition among athletes for NIL compensation. In its February 6, 2025, opinion enjoining the Five-Year Rule, the *Fourqurean* court noted the NCAA's eligibility rules harmed competition for NIL earnings "by categorically excluding athletes after four seasons of competition when their marketability for NIL income is more likely than not to be at its apex." *Fourqurean*, ECF No. 39 at 10-11.

In its Response in Opposition to Plaintiff's Motion for Temporary Restraining Order, the NCAA previews its argument that the challenged Bylaws harm only Arbolida personally, not the market. (Doc. 11 at 13). But the *Pavia* court recently rejected this exact argument, concluding that "restrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects" in the market for NCAA Division I athletics. *See Pavia*, 2024 WL 515988, at *10; *Fourqurean*, ECF No. 39 at 9.

As the foregoing demonstrates, Arbolida can meet his burden of showing that the challenged Bylaws, which impose the JUCO Penalty by limiting the NCAA Division I eligibility of athletes who attend JUCOs to two or three seasons, have substantial anticompetitive effects in the labor market for NCAA Division I athletics.

### b.  The NCAA's Procompetitive Rationale is Not Compelling

Because Arbolida has shown that the challenged eligibility Bylaws have substantial

anticompetitive effects in the market, the burden shifts to the NCAA to articulate a procompetitive rationale for the challenged Bylaws. *Alston*, 594 U.S at 97.

Courts have repeatedly found the procompetitive rationales proffered by the NCAA in other cases involving antitrust challenges to its eligibility Bylaws, including the challenged Bylaws, to be uncompelling. The NCAA has put forth the following procompetitive rationales in other cases to argue that its eligibility Bylaws expand and improve the quality of output for Division I athletic services: (1) preserve intercollegiate athletics as a unique offering distinct from professional sports; (2) foster better alignment between athletics and academics; (3) prevent any decline in consumer demand for college sports with the proliferation of older athletes; and (4) ensure that new cycles of young athletes have the opportunity to participate in collegiate sports. *Pavia*, 2024 WL 515988, at *10, 12; *Fourqurean*, ECF No. 39 at 11; *Ohio*, 706 F. Supp. 3d at 595.

Courts have repeatedly found that preserving intercollegiate athletics as a unique offering distinct from professional sports is not a procompetitive justification for the NCAA's eligibility Bylaws. As the *Pavia* court noted, restricting Division I eligibility of JUCO players to two or three years is not relevant to the "differentiated athletic product" in light of the NCAA's other eligibility rules. *Pavia*, 2024 WL 515988, at *11. For example, the Bylaws permit prep school athletes to compete in games against JUCOs without losing any Division I eligibility—a status quo that is fundamentally unfair to JUCO players. *See id.* at *11 n.9 ("This illustration further illustrates the illogic of the NCAA's rule concerning eligibility afforded to former junior college players."). Similarly, athletes competing in sports such as swimming or gymnastics can compete at the Olympic level, which is akin to professional competition, without losing Division I eligibility. In fact, the NCAA long ago allowed athletes to play professionally in one sport without losing Division I eligibility in another, such as Heisman Trophy winning Quarterback Chris Weinke and former NFL Wide Receiver Kelley Washington, both of whom played professional baseball before beginning their

19

college football careers at 26 and 22, respectively.[12] Moreover, the Division I Council recently approved a Bylaw change that will allow junior and professional hockey players to compete in NCAA Division I hockey with four years of eligibility starting August 2025.[13]

Courts have also rejected the related argument that preserving the amateurism model constitutes a procompetitive justification for the NCAA's eligibility Bylaws. For the *Fourqurean* court, the promotion of amateurism was an unpersuasive justification in light of coaches' salaries, television ratings, and ever-increasing NIL compensation for athletes. *Fourqurean*, ECF No. 39 at 12. The *Ohio* court was unpersuaded by this justification on account of the NCAA's own inability to define "amateurism." *Ohio*, 706 F. Supp. 3d at 595 (citing *In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1071 (N.D. Cal. 2019)).

Moreover, courts have found the NCAA's justification that its eligibility Bylaws foster alignment between athletics and academics unpersuasive. In fact, the *Pavia* court characterized this justification as "pretextual" in light of the NCAA's ever evolving rules "concerning the duration of eligibility" and recent changes to its transfer portal rules. *Pavia*, 2024 WL 515988, at *11–12. With regard to the transfer portal, NCAA rules currently allow unlimited transfers, even though frequent transfers could delay or interfere with standard degree progression, as institutions are not guaranteed to accept transfer credits and offer different degree programs. *Id.* at *12. Moreover, the challenged Bylaws disrupt the standard degree progression of JUCO athletes by pressuring them to transfer to Division I institutions before obtaining their associate degree.

---

[12] *Heisman Winner, Chris Weinke*, HEISMAN, https://www.heisman.com/heisman-winners/chris-weinke/ (last visited Feb. 26, 2025); *Patriots Receiver Kelley Washington Once was a Minor League Teammate of Josh*, STATE JOURNAL-REGISTER (Aug. 2, 2007, 12:01 AM), https://www.sj-r.com/story/news/2007/08/02/patriots-receiver-kelley-washington-once/48487676007/.
[13] *NCAA Lifts Eligibility Ban Allowing Canadian Hockey League Players to Compete at US Colleges,* AP NEWS, (Nov. 8, 2024, 1:16 AM), https://apnews.com/article/ncaa-eligibility-college-hockey-chl-b2a60df517ad20f5f266d3dc870bf909.

The NCAA's argument that its eligibility Bylaws are justified on the grounds that they prevent a potential decline in consumer demand that *may* accompany the proliferation of older college athletes also falls flat. First, the NCAA's Bylaws, which permit athletes to delay collegiate competitions for various reasons—such as religious missions, military services, and service with a foreign aid organization—already encourage older athletes to compete in Division I sports. Athletes who have played at prep schools, in professional hockey leagues, and in professional sports leagues in other sports—all of whom maintain four years of Division I eligibility—are older than their freshmen peers upon initial enrollment at Division I institutions. And as previously mentioned, Weinke was 26 as a freshman and 28 when he led Florida State University to the National Championship and won the Heisman. Thus, whether the presence of older athletes in college sports causes a decline in popularity should be ascertainable; to Arbolida's knowledge, the NCAA has produced no such evidence.

Second, in response to a similar argument about maintaining consumer interest in the context of Bylaw 14.5.5.1 (the Transfer Eligibility Rule), the *Ohio* court explained:

> [S]upposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor. This balancing approach "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)." . . . [T]his approach "is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise."

*Ohio*, 706 F. Supp. 3d at 596. Consistent with *Ohio*, consumer's purported desire to support teams populated by young athletes cannot balance against the harm caused to athletes by the challenged Bylaws. Similarly, any supposed benefit to those athletes who are eligible under the relevant Bylaws to sell their labor to Division I athletics teams cannot counterbalance the harm to the overall market for student-athlete labor that is caused by wholly restricting certain athletes from selling their athletic labor to Division I athletics teams. *See Pavia*, 2024 WL 515988, at *10.

Finally, the NCAA has unsuccessfully justified its eligibility Bylaws on the grounds that they ensure "new cycles" of young athletes are allowed to participate. The *Fourqurean* court dismissed this justification as unpersuasive, reasoning that "the NCAA's own rules already allow Division I football teams to fill roster spots with experienced, transfer players, crowding out younger athletes." *Fourqurean*, ECF No. 39 at 12 (citing *Pavia*, 2024 WL 515988, at *11). Likewise, the NCAA's Bylaws already allow Division I baseball teams to crowd out younger athletes by filling roster spots with older transfer players.

For the foregoing reasons, the NCAA cannot articulate a compelling procompetitive rationale for the challenged Bylaws. Even if the NCAA could put forth such a rationale, its alleged goals can easily be established through less restrictive alternatives, as set forth below.

c.  **Less Restrictive Alternatives Exist to Accomplish Any Procompetitive Rationale**

Arbolida seeks to implement the same less restrictive alternatives proposed by Pavia. Specifically, Arbolida proposes that Bylaws 12.8.1, 12.8.1.1 and 12.02.6 be revised such that an athlete's eligibility begins to run when an athlete first registers as a full-time student at "an NCAA member institution" instead of when the athlete registers at a "collegiate institution." The change would similarly include revising the definition of "intercollegiate competition" to cover competition as part of "an NCAA member institution," rather than competition as part of a two-year school. These changes would permit college athletes more freedom in choosing their collegiate athletics path without restraining their Division I eligibility. At the same time, the revised Bylaws would still foster degree progression by allowing athletes four full years of Division I participation, which tracks with traditional degree progression more than the two or three years of eligibility to which former JUCO athletes are currently limited. The *Pavia* Court recognized that these proposed revisions to the Bylaws provide a less restrictive alternative that eliminates the anticompetitive harms currently present while still furthering procompetitive goals. *Pavia*, 2024 WL 515988, at *12.

Applying similar facts and identical law, the *Pavia* Court ultimately concluded in the "twinkling of an eye," that Pavia had a strong likelihood of succeeding on the merits of his Sherman Act claim because the NCAA Bylaws affecting Pavia–and now Arbolida–are an unreasonable restraint on trade with anticompetitive effects, for which a less restrictive alternative is available. *Id.* Arbolida has made the same showing.

### B.    Arbolida is Suffering and Will Continue to Suffer Substantial, Immediate and Irreparable Harm if Injunctive Relief is Not Granted

Irreparable harm is harm that is "certain, great, actual, and not theoretical." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). The movant must show "the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm," and a significant risk that such harm cannot be remedied with monetary damages after the fact. *Schrier*, 427 F.3d at 1267 (citing *Heideman*, 348 F.3d at 1189); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citing *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

With every missed game, Arbolida suffers substantial, immediate, and irreparable harm. Courts have repeatedly and consistently held that missing athletic competitions, including regular season games, constitutes irreparable harm. *Shannon v. Bd. Of Trustees of the Univ. of Illinois*, No. 24-cv-2010, 2024 WL 218103, at *15-16 (C.D. Ill. Jan. 19, 2024) (holding that University of Illinois varsity basketball player will suffer irreparable harm if not allowed to play); *Ohio,* 706 F. Supp. 3d at 597 ("Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") (citations omitted) (collecting cases); *Williams v. Nat'l Collegiate Athletic Ass'n*, No. 24-614 (ZNQ) (JBD), 2024 U.S. Dist. LEXIS 18479, at *7-8 (D.N.J. Feb. 2, 2024) ("Williams would be forced to forego four more games, depriving him of the opportunity to develop his skills and his in-game rapport with his teammates, further his team's post-

season hopes, to market his name and likeness, and to showcase his abilities to future employers.")
(granting TRO); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn 2009) ("Courts
have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer
irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and
uninterrupted basis.").

In enjoining enforcement of the NCAA's Transfer Eligibility Rule on December 13, 2023,
the *Ohio* court found that winter sport athletes who were ineligible to play were facing current,
immediate, and irreparable harm through the denial of the opportunity to compete in NCAA athletic
events:

> For winter sports, the Transfer Eligibility Rule has forced student-athletes to miss
> games which cannot be replayed. For example: WVU is playing thirty-one (31)
> regular season games this season. RaeQuan Battle has been unable to play in six (6)
> games so far. If he continues to sit out through December, he will miss an additional
> seven (7) games. The missed opportunities for these student-athletes in winter sports
> continues to mount. Missing regular season games constitutes a significant impact on
> the student-athletes' opportunities to develop as players in gametime conditions,
> develop in-game experience with their teammates, showcase their abilities to potential
> employers, and help their teams advance to their respective Conference Tournament
> and NCAA Tournament.
>
> The success of a team in regular season dictates their entrance to their respective
> Conference Tournament and NCAA Tournament. Every game is crucial for a student-
> athlete and their team. Take, for example, March Madness. One good tournament run
> can cement a student-athlete or team's legacy in college sports. The absence of
> student-athletes from teams on gamedays could negatively impact a team's ranking
> and selection to tournaments. Moreover, it may have life-altering impacts on the
> student-athlete's ability to pursue NIL deals and a professional career in their sport as
> well as impacts on their mental health. The substantial and very current harm to winter
> sport Division I student-athletes is irreparable and cannot be easily remedied.
> However, immediate temporary injunctive relief is necessary to allow these winter
> sport Division I student-athletes to compete on gamedays going forward in the season.

*Ohio*, 706 F. Supp. 3d at 598–99.

Arbolida is in the same position as the winter sport athletes in *Ohio* and like those athletes, he
suffers unique, substantial, immediate, and irreparable harm with every missed game. KSU played

the opening game of its Spring 2025 season on February 14, 2025. (Doc. 4-2 at ¶ 5).  As of February 28, 2025, Arbolida has missed nine (9) games.[14] If Arbolida continues to sit out through March, he will miss another nineteen (19) games, bringing his total to 28 missed games—that is, *half of KSU's fifty-six (56) regular season games*.[15]  The longer Arbolida is without injunctive relief, the more difficult it will be for KSU to incorporate him into the team's ongoing games and related preparations.  (*Id*. at ¶ 6). Further, the ability for Arbolida to potentially play another season of Division I baseball (whether at KSU or some other school), during some future season if he later succeeds at trial does not eliminate the irreparable harm he is suffering. *See Shannon*, 2024 WL WL 218103, at *15-16 (citing *Ganden v. Nat'l Collegiate Athletic Ass'n*, No. 96-C-6953, 1996 WL 680000, at *6 (N.D. Ill. 1996 Nov. 21, 1996)) (noting that when a college athlete loses a year of competition, it is likely to inhibit the athlete's development during a critical point in the athlete's career).

Additionally, because enrollment for the Spring 2025 semester has closed and classes have begun, transferring to a non-Division I institution for the Spring 2025 season is not an option for Arbolida. (Doc. 4-1 at ¶ 11). And, because Arbolida's eligibility clock expires after the Spring 2025 season, he would be ineligible to play collegiate baseball at any member institution in the Spring of 2026—the season for which the NCAA has arbitrarily granted other former JUCO athletes a Blanket Waiver.  In essence, if injunctive relief is not granted, Arbolida will have no opportunity to play collegiate baseball.[16]

Absent injunctive relief, final judgment in Arbolida's favor following full trial of this case

---

[14] *2025 Baseball Schedule*, KSTATESPORTS, https://www.kstatesports.com/sports/baseball/schedule (last visited Feb. 26, 2025)
[15] *See supra* note 12.
[16] The NCAA's lack of response to his waiver request has contributed to the urgency of Arbolida's need for injunctive relief.

cannot redress Arbolida's harm. Final judgment in Arbolida's favor following trial would result in Arbolida's eligibility to play, at the very least, in KSU's 2026 Spring season. But the 2026 Spring season is not a substitute for the 2025 season. Now, in the 2025 Spring season, Arbolida has the unique and once in a lifetime opportunity to play for *this* KSU team, at a time when he is coming off a successful year and when his abilities as college baseball player are at or near their peak. Every Division I game in which he competes provides the unique opportunity for him to play with this KSU team, to provide life-altering impacts with respect to a professional career and his legacy as a college baseball player, and to increase his marketability and thus increase his potential NIL earnings. *Shannon*, 2024 WL 218103, at *16 ("[T]he Court concludes that the potential loss of NIL opportunities can constitute irreparable harm."). If not allowed to capitalize on the momentum from his 2024 season, Arbolida cannot effectively build his brand, capitalize off his NIL while his marketability is at its highest, benefit from consumer and scouting exposure, increase his draft prospects, or develop his baseball skills with his current teammates and coaches, who in many cases will not play for KSU during the 2026 spring season, and are not guaranteed to coach for KSU during the 2026 Spring season. (Doc. 4-3 at ¶ 4; Doc. 4-1 at¶¶ 8–9). Thus, treating the 2026 Spring season— which will take place nearly *two years* after Arbolida last played a Division I baseball game—as a substitute for the 2025 Spring season ignores the unique nature and unpredictability of college sports, each game even, including Division I baseball.

As the foregoing makes clear, monetary damages simply cannot remedy the harm Arbolida is suffering, and will continue to suffer, with every missed game during the 2025 Spring season. For these reasons, Arbolida has shown that he is suffering, and will continue to suffer substantial, immediate, and irreparable harm if injunctive relief is not granted.

C.    **The Balance of Equities Favors Granting Injunctive Relief to Arbolida Because Any Potential Harm to the NCAA or Others Would Be Negligible and Outweighed by the Substantial, Immediate and Irreparable Harm that Arbolida**

**is Suffering and Will Continue to Suffer if Injunctive Relief is Not Granted.**

The balance of equities also supports granting Arbolida injunctive relief. Here, the potential harm faced by the NCAA or others by granting Arbolida injunctive relief is negligible. After all, the injunctive relief Arbolida seeks would simply require the NCAA to comply with federal antitrust laws. Courts in other circuits have found that such compelled compliance with federal law cannot constitute harm. *See, e.g., Calvert Health, LLC v. Four Leaf Liquidators, LLC*, 3:23-cv-00110, 2024 WL 69953, at *10 (M.D. Tenn. Jan. 5, 2024). Moreover, enjoining enforcement of an NCAA Bylaw does not cause the NCAA harm. *Ohio*, 706 F. Supp 3d at 600 ("A prohibition on enforcing the [transfer bylaw at issue in that case] causes no harm to the NCAA or any other entity or individual. Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing student-athletes to compete in athletic events already scheduled to take place."). Additionally, permitting Arbolida to participate in the Spring 2025 baseball season would not open a "floodgate" of other waiver requests, because the number of affected athletes is limited to those individuals who are currently enrolled in a Division I institution and are members of a Spring 2025 sports team. In stark contrast, the harm to Arbolida if injunctive relief is denied is and will continue to be substantial and irreparable, as set forth in Section B above. Accordingly, the balance of equities favors granting Arbolida's request for injunctive relief.

**D.      Granting Arbolida's Request for Injunctive Relief will Serve the Public Interest**

The public interest also favors granting injunctive relief to Arbolida. The *Pavia* Court recognized that the public is harmed by the NCAA's anticompetitive bylaws, and that promoting free and fair competition in labor markets serves the public interest. *Pavia*, 2024 WL 515988, at *13. The requested injunction is narrow in scope and would permit Arbolida to compete in the Spring 2025 baseball season for a member institution at which he is already enrolled. In addition, because the NCAA has already granted a Blanket Waiver to JUCO athletes seeking to compete in the 2025-2026

academic year, it cannot, in good faith, claim that the public would be harmed by extending that waiver to a smaller number of former JUCO athletes who are competing in their third year of Division I eligibility this Spring.

## V.    CONCLUSION

For the reasons set forth herein, in Arbolida's Verified Complaint, Motion for Preliminary Injunction, and Memorandum of Law in Support of the same,[17] Arbolida respectfully requests that the Court grant his request for a preliminary injunction, restraining and enjoining the NCAA from enforcing Bylaw 12.02.6 against Arbolida so that Arbolida is eligible to compete in Division I baseball for the Spring 2025 season, and restraining and enjoining the NCAA from enforcing Bylaw 12.11.4.2 against Arbolida or KSU such that Arbolida can reap the benefits of this injunctive relief without being subjected to retaliatory punishment.

**KENNYHERTZ PERRY, LLC**

*/s/ Milton Winter*
Milton Winter, KS Bar # 28776
Braden Perry, KS Bar # 21022
Kristen Andrews, KS Bar # 30066
2000 Shawnee Mission Pkwy Ste. 210
Mission Woods, KS 66205
(816) 527-9447
mit@kennyhertzperry.com
braden@kennyhertzperry.com
kristen.andrews@kennyhertzperry.com

**Attorneys for Plaintiff Cary Arbolida**

---

[17] Arbolida also relies on and hereby expressly incorporates herein by reference all Exhibits, Declarations, and other documents filed by Arbolida on the record thus far.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 28, 2025, a true and correct copy of the foregoing Memorandum of Law in Support of Motion for Preliminary Injunction was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*/s/ Milton Winter*
Milton Winter, KS Bar # 28776