## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CARY ARBOLIDA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) CASE NO. 2:25-cv-02079-JWB-BGS |
| v. | ) |
| | ) |
| | ) |
| **NATIONAL COLLEGIATE** | ) |
| **ATHLETIC ASSOCIATION,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The NCAA respectfully submits that Plaintiff's request for a Preliminary Injunction should be denied, as Plaintiff cannot and has not met the high standard that is required. Plaintiff has failed to establish not only a likelihood of success on the merits, but also the other required elements under Tenth Circuit precedent detailed below.

## PRELIMINARY STATEMENT

Since this Court denied Plaintiff's motion for a temporary restraining order, federal courts in Georgia and Tennessee have denied nearly identical motions for preliminary injunctions filed by college baseball players challenging the very same NCAA Division I rules challenged by Plaintiff here. First, in *Goldstein v. NCAA*, No. 3:25-cv-00027-TES, 2025 WL 662809, at *3 (M.D. Ga. Feb. 28, 2025), the court refused to enter a preliminary injunction because the Division I "eligibility bylaws . . . are not commercial in nature and are, therefore, not subject to antitrust scrutiny." But "even if they were subject to such scrutiny," the court reasoned, Goldstein had "failed to prove that the bylaws he challenge[d] have a substantial anticompetitive effect." The same was true in *Sanchez v. NCAA*, No. 3:25-cv-62, 2025 WL 684271, at *9 (E.D. Tenn. Mar. 3,

2025), where the court held *Sanchez* "cannot demonstrate a strong likelihood of success on his Sherman Act claim," "[b]ecause the limited record [did] not establish that the JUCO Rule has substantial anticompetitive effects."

Like *Goldstein*, this Court should deny Plaintiff's Motion because the JUCO Rule is not commercial in nature and, thus, is not subject to antitrust scrutiny.  But even if it were, Plaintiff fails to establish he has a likelihood of success of the merits of his claim.  In its Order denying Plaintiff's Motion for TRO, the Court held that the record presented by Plaintiff did "not sustain the proposition that the Plaintiff [was] likely to succeed on the merits of his claim" that the NCAA's enforcement of its eligibility rules was in violation of the federal antitrust laws.  Doc. 15 at 10.  "[T]he rule of reason test," the Court explained, "requires a factual analysis of a market to assess market power and market structure.  Such a factual record is lacking here."  Doc. 15 at 5. The Court gave plaintiff the opportunity to brief its request for a preliminary injunction "based on a more complete record." *Id.*   Plaintiff has failed to introduce any evidence in the form of expert analysis, or any declarations or affidavits in support of its motion.  Instead, Plaintiff has simply recycled the same court decisions involving football players that the Court found to be unpersuasive in its Order denying Plaintiff's request for a TRO.  Without any new evidence, the same deficiencies that were fatal to Plaintiff's Motion for TRO compel the denial of his Motion for Preliminary Injunction.

For these reasons and those set forth below, Plaintiff's Motion for Preliminary Injunction should be denied.

## FACTUAL BACKGROUND

For decades, the member schools participating in each of the NCAA's three divisions have maintained rules that define what individuals can compete and for how long.  These rules ensure that college sports are played by student-athletes, advance the educational mission of the member

CORE/9990000.5858/196946941.2

schools, and guarantee that new students attending member institutions can experience unique and life-changing opportunities provided by NCAA athletic competition each year.

Plaintiff, a baseball player currently at his fifth collegiate institution, seeks to invalidate aspects of Division I eligibility rules that limit the number of seasons a student-athlete may play collegiate sports—four seasons—and the number of years in which those seasons must be completed—five years. After he has already obtained associate and bachelor's degrees (Comp. ECF No. 1 at 8 ¶ 33), Plaintiff filed this lawsuit to play additional seasons of college baseball, for the stated goal of earning money from his name, image, and likeness ("NIL"), and to increase his potential draft prospects for the 2025 MLB draft. Memo, ECF No. 19 at 1. In essence, Plaintiff asks the Court to allow JUCO transfers seven years to play six seasons of intercollegiate sports, while student-athletes at NCAA member institutions continue to have only five years to play four seasons.

The previous briefing lays out all the details of plaintiff's collegiate athletic experience and will not be repeated here. Suffice it to say that he was aware that he had completed his eligibility at the end of the 2024 season, as the University of Houston ("UH") submitted an eligibility waiver request on Plaintiff's behalf in June of 2024 that would have allowed Plaintiff to play collegiate baseball for a sixth total season. Exhibit B, Declaration of Jerry Vaughn at 2 ¶ 4. On or about October 11, 2024, Houston's eligibility request was denied under member schools' adopted bylaws and rules that apply uniformly to all of its student-athletes. *Id.* at 2, ¶ 5. Plaintiff did not pursue an administrative appellate remedy at that time. *Id.* at 2, ¶ 6. Instead, he elected to join the University of Tampa's baseball team, a Division II NCAA member institution where he would

CORE/9990000.5858/196946941.2

have been able to compete for one more year.[1]  Instead of playing his final year at Tampa, he transferred to Kansas State University ("KSU"), which is in the same athletic conference as UH, apparently to make another attempt at Division I eligibility.

On or about February 8, 2025, KSU submitted an eligibility waiver request on Plaintiff's behalf that was virtually identical to the previously denied eligibility waiver request that UH submitted in 2024.  *Id.* at 2, ¶ 7.  Before a decision was made on KSU's eligibility waiver request, Plaintiff filed this instant suit.  *Id.* at 2, ¶ 8.

For at least three reasons, the Court should decline Plaintiff's request for the "extraordinary remedy" of a mandatory preliminary injunction that would change the status quo across NCAA Division I collegiate athletics.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  First, Plaintiff cannot make a clear showing that he is likely to prevail on the merits because courts of appeal have repeatedly distinguished rules that are commercial in nature from true eligibility rules, rejecting antitrust challenges to the later. Even if the challenged rules are subject to the Sherman Act, Plaintiff does not demonstrate that they fail the rule-of-reason analysis. Second, Plaintiff cannot establish that he would face irreparable harm if this case were litigated fully on the merits. Finally, the balances of equities and public interest counsel against issuing sweeping relief with minimal economic analysis in the middle of the academic year.

## LEGAL STANDARD

A preliminary injunction is "'an extraordinary remedy, the exception rather than the rule.'" *Uhlig LLC v. CoreLogic, Inc.*, No. 21-2543-DDC-GEB, 2021 WL 5758564, at *2 (D. Kan. Dec. 3, 2021) (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019)).  Because a preliminary injunction is an extraordinary remedy, "the right to relief

---

[1] This is another reason that Plaintiff's purported relevant market is flawed; Plaintiff's own story indicates Division I and Division II schools compete with one another for athletes.

must be clear and unequivocal." *Lenhardt v. City of Mankato, Kansas*, No. 18-4151-SAC-KGG, 2019 WL 1585027, at *1 (D. Kan. Apr. 12, 2019) (quoting *Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehabilitation Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) (citations omitted)). A party seeking a preliminary injunction under Federal Rule of Civil Procedure 65 must show: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable harm absent the injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) the impact of the injunction on the public interest. *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017). Even if the other elements are met, a party that fails to show irreparable harm cannot obtain a preliminary injunction. *Id.* at 1143.

Proving irreparable harm is not "an easy burden to fulfill." *Id.* at 1141 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). "To constitute irreparable harm, an injury must be certain, great, actual, 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). A party seeking interim relief establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258). A claim of "[p]urely speculative" harm does not suffice; instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden. *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1258).

Courts have further held that "preliminary injunctions that alter the status quo," like the one at issue here, are "specifically disfavored" and "must be more closely scrutinized." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (citations and internal quotation marks omitted). To meet his heavy burden, Plaintiff cannot rely on mere allegations or amorphous threats

of potential harm or injury to himself, but rather must present evidence clearly demonstrating that he is likely to prevail on the merits under the Sherman Act. *See Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n*, 40 F. Supp. 2d 1275, 1282-83 (D. Kan. 1999).

## ARGUMENT

## I.     PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

The challenged rules are not commercial in nature and are thus not subject to scrutiny under the Sherman Act.  Moreover, even if the challenged rules were commercial, Plaintiff has failed to establish proof of a properly defined relevant market, and offers no evidence demonstrating that the rules at issue are anticompetitive in a properly defined relevant market.  Instead, plaintiff relies only on other courts' analyses in distinguishable cases.  Nor does Plaintiff present proof that the procompetitive justifications supporting the challenged rules could be achieved through a substantially less restrictive alternative.

### A.     The Challenged Rules Are Not Commercial in Nature and Therefore Are Not Subject to Scrutiny Under the Sherman Act.

"Section 1 of the Sherman Act provides, '[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.'"  *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998) (quoting 15 U.S.C. § 1).  "By its plain language, this section applies to [an NCAA rule] ***only if the rule is commercial in nature***."  *Worldwide Basketball & Sports Tours, Inc. v. NCAA*, 388 F.3d 955, 958 (6th Cir. 2004) (emphasis added).  It matters not that the NCAA is a commercial entity, rather, the "appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'"  *Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (quoting *Worldwide Basketball*., 388 F.3d at 959).

Plaintiff does not analyze whether the challenged rules are commercial in nature. Instead, he summarily asserts that while NCAA eligibility rules were "once considered non-commercial" in nature, that all changed following the Supreme Court's decision in *Alston*. (Doc. 19 at 14). Plaintiff's reasoning—and conclusion—are incorrect. As demonstrated in the recently decided *Goldstein* decision, the NCAA rules at issue are not commercial. *Goldstein*, 2025 WL 662809, at *3.

Plaintiff first argues that district court cases decided since *Alston* have recognized eligibility rules as commercial in nature. Plaintiff errs, however, because the cases he relies upon—*Ohio v. NCAA* and *Tennessee v. NCAA*—did not hold that all eligibility rules were commercial; instead, these cases ***concerned facially commercial rules***. Further, Plaintiff ignores the recent case of *Goldstein*, where the Court held on an antitrust challenge by another student seeking to extend his eligibility over his JUCO play, were not commercial in nature.

In *Ohio*, the United States District Court for the Northern District of West Virginia enjoined the NCAA's "Transfer Eligibility Rule," which disincentivized multiple transfers between intercollegiate institutions. 706 F. Supp. 3d 583, 589. Unlike rules governing the total number of years of eligibility of student-athletes, the court reasoned that the Transfer Eligibility Rule was commercial in nature because it restricted the free flow of labor within the relevant labor market by "limiting the choices [student-athletes] have within the relevant labor market" and by decreasing the quality of the NCAA's product by removing quality players from competition who would not be eligible but for the Transfer Eligibility Rule. *Id.* at 592–94. In its analysis, the court recognized that such disincentive is fundamentally different from the concept of eligibility limits, as it reasoned, "these considerations are magnified given that student-athletes have five (5) calendar years to complete their four (4) seasons of eligibility in any one sport pursuant to NCAA

Bylaw Rule 12.8.1." *Ohio*, 706 F. Supp. 3d at n3.  Accordingly, *Ohio* recognized and did not take issue with the challenged rules in this case.

Next, Plaintiff cites *Tennessee*, which concerned student-athletes' ability to negotiate NIL opportunities during recruitment.  718 F. Supp. 3d 756 (E.D. Tenn. 2024).  The district court reasoned that the restriction was commercial in nature because—by restricting student-athletes' ability to negotiate NIL compensation—the rule had a negative impact on the price for the athletes' NIL rights. *Id.* at 762.  The rule, unlike the challenged rules, facially restricted commerce of student-athletes otherwise eligible for NCAA play.

Plaintiff then turns to *Pavia v. NCAA*, No. 3:24-cv-1336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024), and argues that this Court should adopt its reasoning and conclusions that all NCAA eligibility rules are commercial and that Pavia should be granted an additional year of eligibility.  (Doc. 19 at 15).  The *Pavia* court erred in its reasoning and conclusions.  Specifically, the *Pavia* court erred in concluding that, following the decision in *Alston*, 594 U.S. at 74, any NCAA rule affecting a student-athlete's eligibility is necessarily commercial because it limits athletes' ability to profit off of their NIL.

Quite simply, the court in *Pavia* misconstrued *Alston*.  Alston did not find "true eligibility rules" to be commercial in nature and subject to the Sherman Act—and for good reason.  Those rules include high school graduation requirements, GPA and credit hour minima, and progress towards a degree—all of which are necessary to preserving the essential character of collegiate sports but nevertheless impact student-athletes' ability to take the field.

As is further discussed below, challenged rules regulating the total number of years and seasons in which a student-athlete may play intercollegiate sports are of the same non-commercial nature and are therefore not subject to review under the Sherman Act.

1.     **Prior to *O'Bannon v. NCAA* and *Alston v. NCAA*, Courts Routinely Held that Eligibility Rules Were Not Commercial in Nature and Therefore Not Subject to the Sherman Act.**

Until the recent *O'Bannon* and *Alston* cases, courts faced with antitrust challenges to NCAA eligibility rules routinely concluded that such rules ***are not commercial in nature*** and therefore are not subject to antitrust scrutiny.  For example, in *Gaines v. NCAA*, the court ruled denying eligibility to student-athletes who entered a professional sports draft or hired an agent were not "subject to scrutiny under § 2 of the Sherman Act" because "they are not designed to generate profits in a commercial activity" and instead act to preserve what makes NCAA competition unique.  746 F. Supp. 738, 743 (M.D. Tenn. 1990).  *See also id.* at 744 (observing that the "overriding purpose of the eligibility Rules . . . is not to provide the NCAA with commercial advantage, but rather the opposite extreme—to prevent commercializing influences from destroying the unique 'product' of NCAA college football . . . [and] preserve the unique atmosphere of competition between 'student-athletes.'"); *Agnew v. NCAA*, 683 F.3d 328, 341 (7th Cir. 2012) (explaining that in *NCAA v. Bd. of Regents*, the Supreme Court suggested that eligibility rules are presumptively valid under the Sherman Act); *Jones v. NCAA* 392 F. Supp. 295, 303 (D. Mass. 1975) (holding antitrust laws did not apply to eligibility rules governing payments received from non-NCAA ice hockey leagues).

Other courts have issued similar rulings in the context of NCAA eligibility rules.  The Third Circuit, in *Smith v. NCAA*, concluded that the NCAA's eligibility rules are "not related to the NCAA's commercial or business activities," because "eligibility rules primarily seek to ensure fair competition in intercollegiate athletics."  139 F.3d 180, 185 (3d Cir. 1998).[2]  In *Bowers v.*

---

[2] The Supreme Court denied certiorari on the Third Circuit's ruling regarding the applicability of the Sherman Act, but granted certiorari and reversed and remanded on claims raised under Title IX of the Education Amendments of 1972.  *Smith v. NCAA*, 226 F.3d 152, 153, 154 n.1 (3d Cir. 2001).

*NCAA*, the court dismissed claims challenging "all eligibility requirements," including initial academic qualification requirements, applying the Third Circuit's holding in *Smith*. 9 F. Supp. 2d 460, 497–98 (D.N.J. 1998). *See also Pennsylvania v. NCAA,* 948 F. Supp. 2d 416, 426–28 (M.D. Pa. 2013) (holding scholarship limits did not render enforcement sanctions as commercial activity under the Sherman Act despite scholarship rules being deemed commercial activity in other contexts); *Adidas Am., Inc. v. NCAA* 40 F. Supp. 2d 1275, 1285 (D. Kan. 1999) (declining to extend antitrust scrutiny to an NCAA bylaw concerning "advertising that may appear on . . . apparel worn by student athletes in NCAA competition," because "the bylaw, like the eligibility rules, has neither the purpose nor the effect of giving the NCAA or its member institutions an advantage in any commercial transaction"). Finally, in *Goldstein*, the court held that the challenged rules are not "commercial in nature despite [Goldstein's] efforts to intertwine them with what he and his agent swear are 'significant' opportunities to capitalize off his NIL." *Goldstein*, 2025 WL 662809, at *4.

Just like the cases above, Plaintiff's challenged rules are "explicitly non-commercial," *Bassett*, 528 F.3d at 433, in that they do not "generate profits in a commercial activity," *Gaines*, 746 F. Supp. at 743. Instead, the challenged rules merely establish who can compete in intercollegiate athletic competition and for how long. Those are the precise types of rules whose "overriding purpose . . . is not to provide the NCAA with commercial advantage, but rather the opposite extreme—to prevent . . . destroying the unique 'product' . . . [and] preserve the unique atmosphere of [collegiate] competition.'" *Gaines*, 746 F. Supp. at 743–44. *See also Bassett*, 528 F.3d at 433. Without the ability to restrict student athletic competition to a defined (and necessarily exclusive) class of student-athletes, collegiate sports would lose its unique character.

**2.    Even *O'Bannon* and *Alston* Did Not Find that True Eligibility Rules—Like Those that Regulate Years of Eligibility—Are Commercial in Nature.**

In *O'Bannon v. NCAA*, the plaintiffs challenged the NCAA's compensation eligibility rules, including the prohibition on student-athletes' ability to profit from their NIL. 802 F.3d 1049, 1053, 1055–56 (9th Cir. 2015).  In analyzing NIL restrictions under the Sherman Act, the court did not conclude that all eligibility rules are commercial in nature and thus subject to antitrust scrutiny.  Rather, the court only held that the definition of commerce "surely encompasses the transaction in which an athletic recruit exchanges his labor and NIL rights for a scholarship at a Division I school because it is undeniable that both parties to that exchange anticipate economic gain from it." *Id.* at 1065.  The rules were not exempt from the Sherman Act merely because they were labeled "eligibility rules," but neither did the court determine that all "eligibility" necessarily has commercial implications.  To the contrary, the court distinguished rules that "***clearly regulate the terms of commercial transactions***" from "***a true 'eligibility' rule, <u>akin to the rules limiting the number of years that student-athletes may play collegiate sports</u> or requiring student-athletes to complete a certain number of credit hours each semester***." *Id.* at 1066 (emphasis added).[3]

*O'Bannon* thus clarified a line of demarcation between commercial eligibility rules that "clearly regulate the terms of commercial transactions" by "regulat[ing] what compensation NCAA schools may give student-athletes, and how much," and "true 'eligibility' rules." *Id.*  The former are subject to the Sherman Act, the latter are not.  Under *O'Bannon*, the challenged rules,

---

[3] This distinction originated in *NCAA v. Board of Regents*, 468 U.S. 85 (1984).  In *Regents*, the Court invalided rules restricting the total number of collegiate football games that a network could televise in a given year. *Id.* at 91–94, 113–120.  But in reaching its conclusion, the Court distinguished the rules before it from other rules, explaining in dicta that "most of the regulatory controls of the NCAA are a justifiable means of fostering competition among amateur athletic teams . . . . [t]he specific restraints on football telecasts that are challenged in this case do not . . . fit into the same mold *as do rules* defining the conditions of the contest, *the eligibility of participants*, or the manner in which members of a joint enterprise shall share the responsibilities and benefits of the total venture." *Id.* at 117 (emphasis added).

which "limit the number of years that student-athletes may play college sports" are "true 'eligibility' rules" and are not subject to Sherman Act scrutiny.

Plaintiff contends that all that changed following *Alston*. (Doc. 19 at 14). That is incorrect. The holding of *Alston* was exceedingly narrow. *Alston* concerned NCAA rules that limited the education-related benefits, including monetary, schools could offer to student-athletes. 594 U.S. at 74 (2021). Accordingly, the *Alston* Court did not consider whether that rule was commercial in nature—it plainly was, *id.* at 88–93—and it thus left undisturbed prior cases distinguishing commercial rules subject to the Sherman Act from true eligibility rules, like the challenged rules, that are non-commercial and beyond the reach of the Sherman Act. While the *Alston* Court criticized the dicta in *Regents* discussed in footnote 4, *supra*, it did so only insofar as it did not find *Regents* persuasive **in the context of student-athlete compensation rules** like those criticized in *O'Bannon*. *Id.* at 92–93. Like *O'Bannon*, *Alston* expressed no criticism of NCAA eligibility rules that do not set the price of student-athletes' labor. *Id.* Indeed, Justice Kavanaugh stated in his oft-cited concurring opinion, "[e]veryone agrees that the NCAA can require student athletes to be enrolled students in good standing." *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring). In other words, the NCAA's "true eligibility rules" do not run afoul of antitrust law. Justice Kavanaugh also emphasized that *Alston* concerned "only a narrow subset of the NCAA's compensation rules." *Id.* at 108. Just last week, another district court held that the NCAA eligibility rules are not commercial in nature and stressed the narrow holding of *Alston*. *Goldstein*, 2025 WL 662809, at *3–4.

Accordingly, post-*Alston*, it is clear that rules limiting education-related compensation and benefits are commercial. But it did not in any way change the law governing "true eligibility rules."

CORE/9990000.5858/196946941.2

**B.    Even if the Court Concludes that the Challenged Rules Are Commercial in Nature, Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits Under the Requisite Rule-of-Reason Analysis.**

Even if the Sherman Act applied to Plaintiff's challenged rules, they would not be improper under the Rule of Reason.  Courts presumptively apply a "rule of reason analysis," where Plaintiff carries "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Ohio v. Am. Express Co*., 585 U.S. 529, 541 (2018).  If Plaintiff meets that burden, "the burden shifts to the defendant to show a procompetitive rationale," *id*., and upon such a showing the final burden will shift back to "plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means," *id* at 542.  The Rule-of-Reason analysis requires "a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition," *Alston*, 594 U.S. at 81, which is an exceedingly challenging burden to meet on a truncated record.  *Ciulla-Hall v. NCAA*, No. 25-cv-10271, 2025 WL 438707, at *2–3 (D. Mass. Feb. 7, 2025).  Plaintiff fails at each step.

**1.    Plaintiff Has Failed to Define the Relevant Market, Which Is Fatal to His Claim.**

Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market."  *Am. Express Co.*, 585 U.S. at 542.  "The relevant market is 'the area of effective competition' or the 'arena within which significant substitution in consumption or production occurs.'"  *Brantmeier v. NCAA*, No. 1:24-cv-238, 2024 WL 4433307, at *8–9 (M.D.N.C. Oct. 7, 2024) (quoting *Am. Express Co.*, 585 U.S. at 543).  Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express Co.*, 585 U.S. at 543.

CORE/9990000.5858/196946941.2

Plaintiff pleads no specific facts and provides no expert analysis supporting the existence of a relevant antitrust market and asks the Court to simply assume that "[t]he relevant market in this case is NCAA Division I Athletics in the United States[,]" (*See* Doc. 19 at 11), borrowing the relevant market from the *Pavia*, *House*, and *Tennessee* cases, among others.[4]

Such a broad market definition is not appropriate here.  Relevant antitrust markets are defined around reasonable substitutes for the product at issue.  *See Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 187 (10th Cir. 2025).  As Plaintiff himself acknowledged when he noted that he was not selected in the 2024 MLB draft, (Verified Compl. ¶ 33), professional baseball, including several levels of minor league baseball employing thousands of baseball players, provides opportunities to baseball players that are unavailable to players in other sports after graduation.  There are also non-NCAA opportunities for baseball players, such as JUCO and entering the minor leagues straight out of high school (players who do enter an NCAA program only become eligible for the MLB draft again after their junior year or 21st birthday) *See* Exhibit A, Declaration of Dr. Charles Murry at 5–6 ¶ 17; these opportunities are quite different when contrasted with other sports.  Plaintiff points out that players in other sports play in JUCO (Doc. 19 at 13), but fails to mention that a substantial number of JUCO baseball players are selected in the MLB draft each year (25 in 2024 and 44 in 2023).[5]

---

[4] Plaintiff asserts that the NCAA's post-Alston extension of rights of student-athletes to earn NIL competition to all sports and not just football and basketball suggests that the NCAA itself believes that the relevant market encompasses all sports.  (Doc. 19 at 14).  But nothing about those decisions on the part of the NCAA speaks to whether baseball players have professional opportunities as alternatives to playing baseball in college that are different from the opportunities available to participants in other sports.  Because those opportunities exist, the analysis of the potential reasonable alternatives available to baseball players— and thus the scope of the relevant labor market—is materially different and Plaintiff (and this Court) cannot simply rely on conclusions from prior cases involving football and basketball.  Plaintiff has not supplied facts to support the existence of a Division 1 baseball market and his motion fails on that basis.

[5] *Year in Review: JUCO*, PERFECT GAME, (Dec. 23, 2024), https://www.perfectgame.org/articles/View.aspx?article=23340.

Further, the *Pavia* case cited by plaintiff did not, in fact, have one overall market for Division I athletes; it stated a market for Division I athletes in football. *Pavia*, 2024 WL 5159888, at *8 (finding relevant market in antitrust challenge brought by football player to be "the labor market for college football athletes in general and NCAA Division I football specifically."). So even if one were to accept the market identified under the facts as robustly presented in *Pavia* , plaintiff's sport is baseball, which has very different characteristics and substitutes than football. Thus, the wholesale adoption of the court's  analysis of anticompetitive effects from *Pavia*, is not appropriate in a case.  Murry Decl. at 5–6 ¶ ¶ 14–18 (NCAA's expert opining in response to plaintiff's expert in *Sanchez* regarding the market involving baseball).  As Dr. Murry points out, in addition to the minor leagues mentioned above, there are professional MLB partner leagues and independent leagues available to baseball players as well. *Id.* at ¶ 17.  The same factors come into consideration in the present case.  Plaintiff has not considered or presented any evidence regarding the options available to talented high school baseball players interested in maximizing their income from playing baseball, and how they compare to the options available for participants in other sports—which is necessary to examine in determining and evaluating the effects in a property market.[6]  In addition, the Court in *Ohio v. NCAA*, tied the markets at issue to the specific sports played by the athletes.  For Example, a Division I female diver is not a reasonable substitute for a Division I male baseball player.

In light of just this handful of significant differences between collegiate baseball and the Division I collegiate athletic market more broadly, and on the sparse record before the Court, the

---

[6]  *See 2024 Draft First-Round Signings Tracker*, MLB.COM, (Aug. 1, 2024), https://www.mlb.com/news/2024-draft-signings-and-bonus-tracker (identifying high school players who received millions of dollars to forego college to play professional baseball directly out of high school); *compare* NCAA rules of eligibility for NFL draft (no eligibility for draft until, *inter alia*, athlete has been out of high school for three years).

15

Court should not accept Plaintiff's invitation to simply adopt the relevant product market found in other unrelated cases or presume that Plaintiff is likely to succeed in establishing the existence of a market for Division I baseball in which the NCAA has market power.  *See, e.g.*, *Brantmeier*, 2024 WL 4433307, at \*4–5 (observing that labor markets for NCAA sports vary by sport).

      **2.**      **Plaintiff Has Failed to Meet His Burden to Demonstrate that the Challenged Rules Have a Substantial Anticompetitive Effect.**

Plaintiff cannot demonstrate that the challenged rules are anticompetitive because Plaintiff cannot state a violation of Section 1 of the Sherman Act by alleging harm only to himself rather than market-wide harm to competition.  *See Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club,* 325 F.3d 712, 720 (6th Cir. 2003) (the "antitrust laws were enacted for 'the protection of competition, not competitors,'" so Plaintiff must "present evidence of an injury to a definable market," not just that the "[r]ule might result in significant personal injury to" Plaintiff) (quoting *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338 (1990)).

Plaintiff has not alleged (because he cannot) facts showing any market-wide impact of the NCAA's challenged rules.  *See, e.g.*, *Brantmeier*, 2024 WL 4433307, at \*5 (refusing to enjoin eligibility rules governing acceptance of prize money in non-NCAA competitions after finding evidence of harm to competition "remarkably thin" and based only on harm to only a "few" individuals); *Ciulla-Hall*, 2025 WL 438707 (denying motion for TRO and finding plaintiff unlikely to succeed on the merits of his Sherman Act claim because he "has not even pointed to evidence demonstrating that the application of the [NCAA] rules to his circumstances reflect 'harm to competition in a well-defined antitrust product market'"); *Sanchez*, 2024 WL 684271, at \*7 (denying motion for preliminary injunction because plaintiff failed to prove substantial anticompetitive effects, creating at best a factual dispute).

CORE/9990000.5858/196946941.2

Eligibility rules do not "reduce[] output, increase[] prices, or decrease[] quality in the relevant market[s]." *See Am. Express Co.*, 585 U.S. at 542 (opining that the rules in that case did not affect these factors). *See, e.g., Rock v. NCAA*, 928 F. Supp. 2d 1010, 1023–24 (S.D. Ind. 2013) (holding plaintiffs "failed to adequately allege anticompetitive effects in their market" from challenged rules capping the length and number of scholarships because they "fail to explain how eliminating either [rule] would lead to the creation of more scholarships," i.e. an impact on price or output). NCAA eligibility rules simply establish which student-athletes are eligible for competition. Eligibility rules likewise do not reduce the number of spots available for the alleged market participants. To the contrary, as discussed below, the challenged rules expand output and opportunities by ensuring that participation opportunities are available to incoming students each year.

Plaintiff does not, and cannot, even allege, let alone show, that the challenged eligibility rules lessen the total benefits student-athletes receive from schools, including tuition, cost of attendance, etc.; reduce the total number of intercollegiate competition opportunities or participation; or reduce the quality of offerings in the alleged markets. Like Plaintiff here, the plaintiff in *Brantmeier* essentially sought to displace other student-athletes from Division I opportunities by obtaining eligibility for herself and a few other similarly situated student-athletes. An "elite" few, like Plaintiff and Brantmeier, cannot without market-wide evidence demonstrate harm to competition across the many thousands of student-athletes entering and exiting collegiate competition. *Id.* Likewise, the *Bewley v. NCAA* court refused to enjoin eligibility rules governing acceptance of compensation for competing on a professional athletics team, finding plaintiffs failed to show the "bylaws are unreasonably anticompetitive or restrictive." No. 23 CV 15570, 2024 WL 113971, at *4 (N.D. Ill. Jan. 10, 2024).

Indeed, Plaintiff's collegiate experience exemplifies how time-based eligibility rules enhance opportunity. Plaintiff's opportunities to transfer to UH and KSU were presumably created by the departure of another student-athlete who previously held his spot, as in the natural cycling of student-athletes under the NCAA's eligibility rules.

The challenged rules have the same effect as other true eligibility rules, including requirements of high school graduation, minima for GPA and course enrollment, and other criteria that maintain the unique nature of the NCAA's product, namely, that collegiate athletics are played by collegiate athletes pursuing an education. While eligibility rules do impact athletes' ability to participate, that does not mean that such rules are anticompetitive. In fact, in its denial of Plaintiff's Motion for TRO, this Court stressed that "[b]y placing eligibility limits on students, the NCAA member institutions are increasing competition between themselves by imposing a limit on the potential labor supply." (Doc. 15 at 6). The Court went on to say that "in the absence of the challenged NCAA rules, the supply of student athletes to the relevant labor market would likely increase substantially since athletes could continue to participate in the market indefinitely so long as they met all the other eligibility requirements." *Id.* at 6–7. The *Sanchez* court agreed, and emphasized that the increased competition as a result of the challenged rules "drives up compensation for athletes." *Sanchez*, 2024 WL 684271, at *7.

Plaintiff relies heavily on the *Pavia* decision and argues that the challenged rules are anticompetitive because they (1) give Division I member schools a competitive advantage over JUCOs and (2) lead to disparate treatment of the athletes at these institutions. (*See* Doc. 19 at 17).

This discussion and potential harm highlights why Plaintiff has not properly defined a relevant market or shown any anticompetitive effects in that market. Plaintiff contends that the challenged rules cause harm to "NCAA Division I Athletics in the United States" *id.* at 11, but

then also contends that the harm is disparate treatment of athletes at JUCO institutions, who are not a part of the relevant market posited by Plaintiff.  JUCO athletics are, of course, not NCAA Division I Athletics in the United States

In any event, the harm alleged—differential treatment of JUCO transfers in Division I—misconstrues the nature of the challenged rules.  The challenged rules do not, as Plaintiff argues, penalize JUCO transfers.  Rather, Plaintiff takes issue with the challenged rules ***treating all intercollegiate competition in the same manner***.  What Plaintiff frames as unequal treatment, the NCAA treats as equity:  All student athletes get five years to complete four seasons of intercollegiate competition.  The alternative would be to treat JUCO transfers ***more favorably*** to those student-athletes who first matriculate to a Division I member institution.  If that were the case, JUCO transfers would benefit from banking additional academic credits, strength training, competitive experience, and other similar benefits obtained in JUCO, which other Division I student athletes do not receive the benefit of, before the eligibility clock starts.  There is no evidence in the record that this absence of favorable treatment for JUCO transfers is anticompetitive.  Absent competent evidence, whether the challenged rules are "equitable" or a "penalty" is a matter of rhetorical framing and one's own perspective.  Framing alone does not suffice to meet Plaintiff's ***evidentiary burden*** to demonstrate substantial anticompetitive effects from the challenged rules.  With only framing and without evidence, Plaintiff is not entitled to injunctive relief.

And—to the extent the anticompetitive harm is cognizable—it is not a substantial anticompetitive effect ***to the market***.  The effect to the market is neutral because there would be an equal-and-opposite anticompetitive harm to non-JUCO transfers if the Court awards Plaintiff his requested remedy.

At bottom, Plaintiff essentially argues that it is unfair to treat JUCO transfers differently from athletes who matriculate to Division I institutions from high school, Division II, or Division III. Even if Plaintiff's concerns had merit, the Court here is not tasked with determining whether the challenged rules are reasonable in light of Plaintiff's individual circumstances. Rather, the relevant inquiry is simply whether the challenged rules harm competition in the market. They do not.

### 3.    If the Court Proceeds to Step Two of the Rule-of-Reason Analysis, the Challenged Rules Have Substantial Procompetitive Benefits.

Even if Plaintiff were to meet his burden of showing substantial anticompetitive effects, the challenged eligibility rules have several procompetitive benefits, including: 1) preserving intercollegiate athletics as a unique offering to many prospective and current student-athletes, expanding output; and 2) enhancing the experiences of student-athletes, improving quality of output. *See* Murry Decl. at 6 ¶¶ 19–22, where an economist for the NCAA has opined upon the various procompetitive benefits of eligibility rules in a recent matter specifically involving the sport of baseball.

First, several courts have concluded that the NCAA's rules governing who is eligible to compete are procompetitive because they expand output by creating and preserving the unique offerings of Division I athletics. For example, the Seventh Circuit in *Agnew* cited decisions from several sister courts of appeals and explained that "[m]ost—if not all—eligibility rules . . . fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations" because those regulations "in college [sports]" are "necessary for the product to exist." 683 F. 3d at 342–43; *see also Smith*, 139 F. 3d at 187 (upholding a graduate student eligibility rule and opining that "in general, the NCAA's eligibility rules allow for the survival of the product,"); *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1089–90 (7th Cir. 1992) (eligibility rules

CORE/9990000.5858/196946941.2

"constitute eligibility requirements essential to participation in NCAA sponsored amateur athletic competition"); *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1344–45 (5th Cir. 1988) (noting "college football [is] a product distinct from professional football. The eligibility rules create the product and allow its survival . . . ."); *see also Regents*, 468 at 101–02 (observing that NCAA rules which "create and define the competition" "play[] a vital role in enabling college football to preserve its character, and as a result enable[] a product . . . which might otherwise be unavailable," and "widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.") [7];

Another court has likewise held that eligibility rules related to entering a professional athletics draft "are overwhelmingly procompetitive, are justified by legitimate business reasons, and consequently cannot be viewed as having any unreasonably exclusionary or anticompetitive effect." *Gaines*, 746 F. Supp. at 747. In application, the *Gaines* court explained that the "no-agent" and "no-draft" eligibility rules "have primarily procompetitive effects in that they promote the integrity and quality of college football and preserve the distinct 'product' of major college football." *Id.* at 746.

And just last year, *Bewley* similarly held that eligibility rules restricting pre-enrollment compensation from non-NCAA sources "directly promotes defendant's 'unique product.'" 2024 WL 113971, at *4. *See also Banks v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 850, 861 (N.D.

---

[7] In *Alston*, the Supreme Court clarified that *Regents* "may suggest that courts should take care when assessing the NCAA's restraints on student-athlete compensation, sensitive to their procompetitive possibilities," but that courts should not "reflexively reject *all* challenges to the NCAA's compensation restrictions." 594 U.S. at 92. Still, the *Alston* court reaffirmed the holding in *Regents* that "some 'horizontal restraints on competition are essential if the product is to be available,'" and confirmed it was providing "analysis [that] is fully consistent with" the holding in *Regents*. *Id.* at 91–92.

CORE/9990000.5858/196946941.2

Ind. 1990) ("Courts applying the Rule of Reason have consistently noted the procompetitive effects of NCAA eligibility regulations.").

These authorities compel the same result here. The challenged rules preserve the character of collegiate athletics necessary for the product to exist.

Second, the challenged rules enhance access to Division I baseball, both expanding total athletic output and improving quality of output, i.e. improving student-athlete experience. Division I baseball opportunities are finite, and if student-athletes avail themselves of those opportunities for longer than they are currently eligible, then some student-athletes will necessarily lose opportunities they otherwise would have received. Therefore, if the challenged eligibility rules were enjoined or additional seasons of competition were mandated, collegiate baseball programs will have greater demand for more developed, experienced players, crowding out other student-athletes who would otherwise get the opportunity to replace those no longer eligible. In other words, like the rules at issue in *Bewley*, the challenged rules here "directly promote[] [the NCAA's] 'unique product' of amateur sports" by naturally ensuring that after student-athletes have exhausted their allotted period of eligibility, new student-athletes can come in and replace them. 2024 WL 113971, at *4. *See also* Murry Decl. at 6 ¶¶ 19–22.

The challenged rules also protect competitive balance by ensuring that student-athletes compete against their peers and not quasi-professional athletes who have had several years of additional experience. *See Smith*, 139 F.3d at 187 (holding eligibility "bylaw at issue . . . is a reasonable restraint which furthers the NCAA's goal of fair competition . . . and is thus procompetitive"). The natural cycling function of the challenged rules both ensure more student-athletes participate in Division I baseball and improve the quality of those student-athletes' experiences by making opportunities more accessible.

Third, the challenged eligibility rules also improve quality of output by fostering better alignment between Division I athletics and academics. As set forth earlier, enjoining the rules or expanding eligibility would extend the length of student-athletes' participation in collegiate athletics. But extending the eligibility of student-athletes would also interrupt the NCAA's goal of progressing student-athletes toward a degree in a timely manner. Put differently, starting the eligibility clock upon full-time enrollment in a college better aligns both the collegiate academic and athletic experience. Courts have recognized the procompetitive nature of these results—a preserved space for collegiate competition with requirements for entry and an imposed timeframe to exit that cohesively melds NCAA member schools' academic and athletic objectives. *See McCormack*, 845 F. 2d at 1344-45 ("The goal of the NCAA is to integrate athletics with academics. [Eligibility] requirements reasonably further this goal"); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 974 F. Supp. 459, 461 (D.N.J. 1997) (noting that the initial eligibility requirements are designed 'to assure proper emphasis on education objectives'").

### 4. There is No Substantially Less Restrictive Manner by Which the NCAA Could Achieve the Procompetitive Benefits of the Challenged Rules.

Plaintiff also fails to establish the challenged rules are "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits." *Alston*, 594 U.S. at 101 (citation and internal quotation marks omitted). This burden is high because "antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes," and, instead, "antitrust courts must give wide berth to business judgments before finding liability." *Id.* at 98, 102. "To the contrary, courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" *Id.* at 98 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227 (D.C. Cir. 1986)). Plaintiff's alternatives must be "substantially less restrictive" and "virtually

23

as effective in serving the defendant's procompetitive purposes without significantly increased cost." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (cleaned up, citation and internal quotation marks omitted). The alternatives must also be narrowly tailored to achieve Plaintiff's suggested objectives. *See Williams v. Owens*, No. 90-5918, 1991 U.S App. LEXIS 16703, at *7 (6th Cir. 1991) (holding that "[a]n injunction should be narrowly tailored to give only the relief to which the plaintiff is entitled"). "Not only do plaintiffs bear the burden at this step, but the Supreme Court has admonished that we must generally afford the NCAA 'ample latitude' to superintend college athletics." *O'Bannon*, 802 F.3d at 1074 (quoting *Regents*, 468 U.S. at 120); *see also Law*, 134 F.3d at 1022 (10th Cir. 1998) (eligibility rules "are justifiable under the antitrust laws because they are necessary to create the product of competitive college sports.") (quoting *Regents*, 468 U.S. at 117); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) (explaining, generally, that "sports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport"). Far from narrow relief, Plaintiff seeks to enjoin a broadly applicable eligibility rule, potentially impacting thousands of student-athletes in the middle of the academic year.

Plaintiff alleges the challenged rules could be revised to begin the eligibility clock and the five-year rule should apply upon full-time enrollment in an "NCAA member institution," instead of a "collegiate institution," as currently set forth (Doc. 19 at 17), within their alleged relevant market of Division I sports. That proposal is not substantially less restrictive, it is minimally so as Division II, Division II, NAIA, and FCS would all remain subject to the rules, even if JUCO was eliminated. To rule in such a manner would be to ignore the caution from the *Alston* court denouncing small judicial tweaks.

Additionally, the proposed change would not achieve the same procompetitive efficiencies because it would create significant incentives for prospective student-athletes not to use junior college as a time for academic progress as well as athletic competition, but rather as a baseball-focused way station for two years before attending an NCAA member school for four additional seasons.  Moreover, by challenging only the definition of "intercollegiate competition" and not the challenged rules themselves, Plaintiff is questioning only the degree of efficiency of the challenged rules as constructed, and Courts are admonished not to engage in such inquiries.

As the *Alston* Court instructs, the NCAA must have wide berth to make business judgments in promulgating rules that preserve the nature of its product.  594 U.S. at 91–92.  Collegiate sports are still a product unique from professional sports, and encompass athletic competition of ***student-***athletes.  The Five-Year Rule, generally, and counting all intercollegiate competition (not just Division I) toward the five-year clock, specifically, is essential to preserving the collegiate nature of participation in college athletics.  Without this rule, JUCO can be used as a "minor league" for student athletes before they enter Division I for four full seasons (without any guarantee that Division I opportunities will exist for those student-athletes at the conclusion of their JUCO competition); whereas today, JUCO provides an opportunity for students-athletes to compete at a higher level than high school athletics and the potential to one day compete in Division I or professional baseball.  Moreover, if student-athletes transferring from JUCO institutions are permitted seven years to play six seasons of collegiate baseball (which is what Plaintiff is requesting)without the challenged rules, then JUCO athletes will have an unfair advantage over those who matriculate to NCAA Division I member institutions from high school—they will be more physically mature, more experienced in their chosen sport, and will have opportunity to take

CORE/9990000.5858/196946941.2

the minimum allowable course load after transferring because they will have banked credits from their time in JUCO—all advantages that non-transferring students do not have.

Finally, the logic underlying Plaintiff's request to enjoin counting JUCO participation as intercollegiate competition for purposes of the Five-Year Rule applies equally to enjoining the Five-Year Rule altogether. Either way, the Five-Year Rule restricts the time in which an athlete may participate in Division I intercollegiate athletics. If Plaintiff is correct that he is irreparably harmed by not receiving a third or fourth season of Division I competition, he is likewise harmed if he does not receive a fifth, sixth, seventh or eighth season. That is why the Supreme Court instructs that "static judicial decrees in ever-evolving markets may themselves facilitate collusion or frustrate entry and competition. To know that the Sherman Act prohibits only *unreasonable* restraints of trade is thus to know that attempts to '[m]ete[r]' small deviations is not an appropriate antitrust function." *Alston*, 594 U.S. 99 (internal citations omitted) (emphasis in original).

## II.    PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM.

Plaintiff likewise fails to meet his required burden of showing irreparable harm. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("[T]his factor *is* dispositive; a plaintiff *must* present the existence of an irreparable injury to get a preliminary injunction."); *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) ("[T]he irreparable harm requirement is 'indispensable.'") (citation omitted). He unreasonably delayed before filing this suit and cannot now claim irreparable harm in support of his request for the extraordinary remedy of a preliminary injunction. *Huron Mountain Club v. U.S. Army Corps of Engineers*, 545 F. App'x 390, 397 (6th Cir. 2013). Moreover, even if Plaintiff had timely filed his suit, he has not sufficiently established that he is "certain" to suffer "immediate" irreparable harm. *Sumner Cnty. Schs.*, 942 F.3d at 327 (citation and internal quotation marks omitted).

CORE/9990000.5858/196946941.2

A.    **Plaintiff's Delay in Seeking the Instant Relief Weighs Against a Finding of Irreparable Harm.**

As the NCAA described in its opposition to Plaintiff's Motion for TRO, Plaintiff could have brought this suit months or years ago. (Doc. 11 at 7–9). He should not be rewarded for his undue delay.

B.    **Plaintiff Will Not Suffer Any Irreparable Harm if Denied a Preliminary Injunction.**

As the NCAA described in its opposition to Plaintiff's Motion for TRO, Plaintiff's harm is quantifiable and therefore reparable. (Doc. 11 at 11). All other potential harm is merely speculative. *Id.*

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGHS AGAINST INJUNCTIVE RELIEF.

As the NCAA described in its opposition to Plaintiff's Motion for TRO, the challenged rules impact over 180,000 Division I student-athletes. (Doc. 11 at 14). The NCAA encourages this Court to exercise caution in changing eligibility rules wholesale in the middle of the season based on a truncated record.

## <u>CONCLUSION</u>

For reasons set forth above, Defendant NCAA respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

<u>s/ Victoria L Smith</u>
Victoria L. Smith (KS 16502)
Douglas R. Dalgleish (KS 22328)
Stinson LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
T: (816) 842-8600
F: (816) 691-3495
Doug.dalgleish@stinson.com
Vicki.smith@stinson.com

27

Naima S. Starks (*admitted pro hac vice*)
Stinson LLP
1775 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
T: (202) 572-9937
F: (202) 572-9987
Naima.starks@stinson.com

*Counsel for Defendant*
*National Collegiate Athletic Association*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, I electronically filed the foregoing Opposition to Plaintiff's Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties and counsel of record.

Dated: March 7, 2025

By: */s/ Victoria L. Smith*
Douglas R. Dalgleish
Stinson LLP
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Doug.dalgleish@stinson.com
*Counsel for Defendant*
*National Collegiate Athletic Association*

CORE/9990000.5858/196946941.2